Virgie Lee VALLEY et al., Plaintiff-Appellee,

United States of America, Intervenor-Appellee,

v.

RAPIDES PARISH SCHOOL BOARD et al., Defendants-Appellants.

Virgie Lee VALLEY et al., Plaintiffs-Appellees,

United States of America, Intervenor-Appellee,

v.

RAPIDES PARISH SCHOOL BOARD et al., Defendants,

Clyde Holloway et al., Defendants-Appellants.

Virgie Lee VALLEY et al., Plaintiffs-Appellees,

v.

RAPIDES PARISH SCHOOL BOARD, Defendant,

v.

Nelson LaBORDE et al., Intervenors-Appellants,

v.

UNITED STATES of America, Intervenor-Appellee.

Virgie Lee VALLEY et al., Plaintiffs-Appellees,

United States of America, Intervenor-Appellee,

v.

RAPIDES PARISH SCHOOL BOARD, Defendant,

Marshall T. Cappel, Sheriff of Rapides Parish, Movant-Appellant.

Virgie Lee VALLEY et al.,
Plaintiffs-Appellees,

v.

RAPIDES PARISH SCHOOL
BOARD, Defendant,

v.

Nelson LaBORDE et al.,
Intervenors-Appellants,

v.

UNITED STATES of America,
Intervenor-Appellee.

Virgie Lee VALLEY et al.,
Plaintiffs-Appellees,
and

United States of America,
Intervenor-Appellee,

v.

RAPIDES PARISH SCHOOL
BOARD, Defendant,
State of Louisiana et al.,
Defendants-Appellants.

Nos. 80–3722, 80–3776, 80–3855, 80–3988,
80–3008, 81–3013, 81–3033 and 81–3083.

United States Court of Appeals,
Fifth Circuit.

Unit A

May 18, 1981.

Rehearing Denied No. 80–3988
July 9, 1981.

Opinion on Rehearing, No. 80–3722

Aug. 14, 1981.
See 653 F.2d 941.

John F. Ward, Jr., Robert L. Hammonds, Baton Rouge, La., for Rapides Parish School Board.

Daniel Popeo, Gen. Counsel, Washington, D.C., amicus curiae, for Washington Legal Foundation.

Michael R. Connelly, Baton Rouge, La., amicus curiae for Justice Foundation.

Louis Berry, C. Spencer Torry, Alexandria, La., for Valley in all cases.

Walter W. Barnett, Atty., Carol E. Heckman, James P. Turner, Dept. of Justice, Civil Rights Div., Washington, D.C., for U. S. A.

Christopher J. Roy, Alexandria, La., Professor Paul Baier, Baton Rouge, La., for Holloway, et al., defendants-appellants in No. 80–3776 and as intervenors-appellants in No. 80–3855.

J. Minos Simon, Lafayette, La., for LaBorde.

Charles F. Wagner, Pineville, La., for Cappel.

Ellis C. Magee, Asst. Atty. Gen., Thomas F. Wade, Baton Rouge, La., for State of La.

Christopher J. Roy, Alexandria, La., for Judge Lee.

Before COLEMAN, GARZA and SAM D. JOHNSON, Circuit Judges.

GARZA, Circuit Judge:

Twenty-seven years after *Brown v. Board of Education* and sixteen years after the commencement of this litigation, we are confronted with yet another set of appeals arising from implementation of the com-

mand to desegregate public schools in Rapides Parish, Louisiana. The current appeals stem from the district court's response to a Motion for Supplemental Relief filed by the private plaintiffs in 1979. We consolidated them for argument, and now render our decision in each by this opinion.

Though the Rapides Parish School Board was long ago admonished of its continuing duty to accomplish the dismantling of racial duality in pupil and staff assignments, complex and important issues have been raised by the effort to achieve this goal. Is the school system fully unitary? If not, what further relief is required? Are the orders issued below a proper response to the facts of the case and previous directives of this court?

Sadly, these are not the only issues. This case has been unnecessarily complicated by the failure of all parties in interest to adequately aid the district court, as well as by overt interference with and defiance of its orders by certain elements in the community. We are therefore called upon to decide whether additional orders issued by the district court in aid of its jurisdiction and authority were within the permissible bounds of discretion.

## BACKGROUND

While Rapides Parish is predominantly rural, it contains one large city, Alexandria. A single school system serves the entire parish. Prior to 1965, the system was classically dual, with one set of schools operated for white pupils and another for blacks.

This litigation was instituted on March 23, 1965, and resulted in the employment of a number of devices to establish a unitary system. Originally, the district court approved a desegregation plan relying on "free transfer" provisions, which remained in effect until 1969. Under its operation, white pupils continued to attend all-white schools and more than 96 per cent of black pupils continued to attend all black schools.

The plaintiffs moved for supplemental relief following the Supreme Court's decision in *Green v. School Board of New Kent County*, 391 U.S. 430, 88 S.Ct. 1698, 20 L.Ed.2d 716 (1968), invalidating a freedom of choice plan which had failed to achieve meaningful desegregation. The district court held that the plan then in effect *did* create a real prospect of dismantling the dual school system. *Conley v. Lake Charles School Board*, 293 F.Supp. 84, 88 (W.D.La. 1968).

We reversed and remanded for the implementation of a new plan. *Hall v. St. Helena Parish School Board*, 417 F.2d 801 (5 Cir. 1969), *cert. denied* 396 U.S. 904, 90 S.Ct. 218, 24 L.Ed.2d 180 (1969). Upon review of the relevant statistical facts, it was held "abundantly clear that freedom of choice as presently constituted and operating ... does not offer the 'real prospect' contemplated by *Green*." 417 F.2d 801 at 809. Alternative measures were suggested, including "geographic zoning ... pairing of grades or of schools, educational clusters or parks, discontinuance of use of substandard buildings and premises, rearrangement of transportation routes, consolidation of schools, appropriate location of new construction, and majority-to-minority transfers." *Id.*

Once again, however, there was a disparity between the intended effect of relief and the actual result. In 1969 and 1970, the court below adopted three neighborhood zoning plans, each of which was reversed for failure to present an adequate prospect of dismantling the dual school system.

In July of 1969, the court approved a plan offered by the school board which relied on neighborhood zoning or partial pairing, but left 13 schools over 90 per cent black. This court reversed and remanded in *Valley v. Rapides Parish School Board*, 422 F.2d 814 (5 Cir. 1970), again ordering the formulation of a new plan.

The district court next chose a school board plan which made minimal student assignment changes, citing "the extreme shortness of time confronting the school board." We reversed summarily, remanding the case with "instructions to the district court to implement pendente lite [a plan offered by HEW] ... or a plan de-

vised by the district court to accomplish a unitary system within the teachings of *Green v. County School Board." Valley v. Rapides Parish School Board*, 423 F.2d 1132, 1133 (5 Cir. 1970).

On remand, the district court adopted its own plan for Wards 1 and 8 of the parish, which encompass the city of Alexandria. (See the map of Rapides Parish attached as an appendix hereto.) The plan assigned pupils in those wards to the schools nearest their homes, and reinstated previous plans for the remaining wards with some modifications. Once again, this court was obliged to partially reverse. In *Valley v. Rapides Parish School Board*, 434 F.2d 144, 145 (5 Cir. 1970), those portions of the order below "which [did] not concern either student assignment in Wards 1 and 8 or the majority-to-minority transfer policy" were affirmed. As for the city wards, the court noted that black pupils accounted for 47 per cent of the total enrollment and held:

> Because of the residential dichotomy between Alexandria's black and white citizens, the so-called "neighborhood school plan" adopted by the district court, although admittedly impartial as to race, still leaves 60% of the black students in schools where their race is an approximately 90% or greater majority. Of the twenty-four remaining schools seven remain predominantly negro.

> The end result is that neighborhood zoning in Alexandria, Louisiana, leaves the majority of the city's negro students in a virtually segregated school system. *Id.*

The court then set out in detail a plan to remedy the deficiency in eliminating racially identifiable schools, and ordered the district court to implement that plan or one which would achieve the same result. Notably, it was admonished that "[T]he fact that the plan complies with the requirements for a neighborhood system as enunciated by this court in *Ellis v. Board of Public Instruction of Orange County, Florida*, (5

Cir. 1970), 423 F.2d 203, does not make the system constitutionally palatable unless the plan actually works to achieve integration." *Id.*

Following this remand, a geographic plan for Wards 1, 8 and 9 was devised and implemented. The district court retained jurisdiction. In 1973 and 1974, the United States, as intervenor, moved for supplemental relief. It alleged that enrollments projected under the 1971 plan had not been met, and pointed to the continued existence of racially identifiable schools. The 1973 motion resulted in some adjustments and the 1974 motion was suspended "until further orders of [the] court."

Renewal of litigation leading immediately to these appeals began on August 31, 1979, when the private plaintiffs filed a Motion for Supplemental Relief complaining of the persistent spectre of one-race schools. They further alleged non-compliance with the teacher ratio requirements of *Singleton v. Jackson Municipal Separate School District*, 419 F.2d 1211 (5 Cir. 1969), and employment discrimination in the hiring of staff and faculty. The government moved to reschedule hearing on its 1974 motion, contending that the same schools which had been all-black or virtually so in 1974 remained segregated in 1979.

Statistical facts supporting the need for further relief were compelling. At the close of the 1979–80 school year, the board operated thirty elementary, seven junior high, and twelve high schools. These were attended by 24,622 pupils, of whom 8,793 (35.7 per cent) were black and 15,829 (67.3 per cent) were white.[1] 76 per cent of the pupils attended school in Alexandria, or in the adjacent communities of Pineville and Tioga in Wards 9 and 10. 74 per cent of all black pupils attended Alexandria schools where they constituted a majority of 56 per cent. A comparison of enrollment figures for 1965 when the schools were officially segregated with those for 1980 reveals that almost no progress was made in ten schools,

---

1. These figures omit the number of pupils attending three special purpose facilities which are not involved in the plan.

nine in Alexandria and one in the Ward 3 community of Cheneyville.[2]

The matter was heard on April 29 and 30, 1980. The government presented testimony on the continued existence of one-race schools and the plaintiffs' employment discrimination claims. It proposed a plan prepared by its expert, Dr. Gordon Foster, which utilized clustering and pairing to abolish one-race schools in Wards 1, 8, and 9. The plaintiffs endorsed this plan, and called for desegregation of other racially identifiable schools. They offered no plan of their own. The school board stated its opposition to the government plan, maintaining that the system was unitary. It offered no plan.

On June 6, the district court issued a short preliminary opinion, stating:

> It is conceded that there are a number of racially identifiable schools in the Rapides Parish School System. We find from the record that the existence of all of the racially identifiable schools has not been justified as contemplated under *Swann v. Charlotte-Mecklenburg Bd. of Education*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); and that the Rapides Parish School System is not unitary and that additional relief must be granted. *Lee v. Macon City Bd. of Education*, [616] F.2d [805] (5 Cir. 1980).

The court rejected the Foster plan, criticizing it on the ground that it failed to cover the Alexandria metropolitan area, much less the entire system. Notice was served that the court would draw its own plan.

That plan was issued on July 3, and the parties were given 15 days to respond with comments or recommendations. After a hearing in the nature of a status conference, the court entered final judgment adopting its plan on August 6, 499 F.Supp. 490 (W.D.La.). The school board was ordered to implement it for the 1980–81 school year, set to commence on August 20.

## THE PLAN

The district court opens with a statement of principles. Busing is called "an essential element of our public school systems for many years," which would be used "purposefully and constructively." The court recognized "that neighborhood schools in metropolitan areas should exist but only to the extent that they do not impair or inhibit the establishment of an integrated school system." This recognition was followed by the curious observation that neighborhood schools "do not exist outside of metropolitan areas." The court allowed that it would give "due recognition to physical circumstance and to individual interests," and finally noted that "construction of new school buildings and disposition of old school buildings ... and sites can substantially affect that development of a unitary system."

The specific remedial orders contained in the plan are aimed at eliminating the Alexandria and Cheneyville one-race schools.

2.

| | 1965 ENROLLMENT % of Black Pupils | 1980 ENROLLMENT % of Black Pupils |
|---|---|---|
| **ALEXANDRIA** | | |
| Aaron Elementary | 100 | 100 |
| Acadian Elementary | 1 | 100 |
| Lincoln Road Elementary | 100 | 99 |
| Lincoln Road Primary | | 97.7 |
| Peabody Elementary | 99.7 | 100 |
| Silver City Elementary | 100 | 100 |
| South Alexandria Elementary | 100 | 99.5 |
| South Alexandria Primary | 100 | 100 |
| Jones Street Junior High | 100 | 93.9 |
| **WARD 3** | | |
| Lincoln Williams Elementary | 100 | 92.9 |

Thus, attendance is realigned in the two separate areas, with one school involved in the desegregation of both. Mandatory pupil reassignment orders are coupled with a majority-to-minority transfer provision.

Desegregation of the eight Alexandria area elementary schools bearing a racial stigma was accomplished by clustering all elementary schools in Wards 1, 8, 9, and 10 into four groups, each containing two of the schools. Four of the facilities, South Alexandria Elementary, Lincoln Road Elementary, Peabody Elementary, and Acadian Elementary, one in each cluster, became sixth grade centers to be attended by all sixth graders within each cluster. The plan additionally required the transfer of sixth grade pupils from the Ruby Wise School in Ward 10 to South Alexandria Elementary. Pupils in grades K–5 from the four new sixth grade schools were reassigned to predominantly white schools in their cluster.

Of the other four racially identifiable elementary schools, Aaron Elementary was closed, and South Alexandria Primary, Lincoln Road Primary, and Silver City, one in each of three clusters, were slated to serve grades K–2. They were projected to remain primarily black. Pupils in grades 3–5 from these schools were reassigned to primarily white schools in their cluster.

Thus, elementary school desegregation in Alexandria was accomplished by reassignment of pupils within compact geographic zones. The continuing predominance of black pupils at K–2 schools in three of the clusters was justified through reliance on neighborhood school considerations for the very young. The effect of these reassignments is indeed apparent, and appears to have been largely satisfied by actual enrollment figures for fall, 1980.[3]

To desegregate the Jones Street Junior High School in Alexandria, the court rezoned attendance for each of the five junior high schools in Wards 1, 8, 9, and 10, aiming to achieve a minority enrollment of approximately 40%. Additionally, 205 white students from predominantly white schools in Wards 2 and 11 were assigned to Jones

3. The following shows the impact of the plan on the eight predominantly black elementary schools listed above in note 2.

| | Grade | % Black Under Plan Projections | % Black Under Actual Enrollment |
|---|---|---|---|
| (GROUP 1) | | | |
| South Alexandria Primary | K-2 | 99.6 | 99.3 |
| South Alexandria Elementary | 6 | 44 | 44.7 |
| (GROUP 2) | | | |
| Lincoln Road Primary | K-2 | 97.8 | 96.3 |
| Lincoln Road Elementary | 6 | 44.5 | 43.3 |
| (GROUP 3) | | | |
| Silver City | K-2 | 100 | 99.8 |
| Peabody | 6 | 39.3 | 54.4 |
| (GROUP 4) | | . | . |
| Acadian | 6 | 39.8 | 39.5 |

The Court's reasoning and the policy considerations used in formulating this portion of the plan were described as follows:

We determined that better attendance by whites would be assured if schools in the black area became 6th grade schools, each integrated class having attended school together in grades 3, 4 and 5. We were also aware that busing the entire class to a different school in the white area for grades 3, 4 and 5 would accomplish nothing for integration and that both blacks and whites would be better served if the class from the school in the black area were split in three sections with each section attending one school in the white area for a period of three years. Blacks and whites alike would benefit from attending the same school for 3 out of the 4 years during which the class was clustered. It would also reduce the busing of whites. All students, whether clustered or not, attend the 6th grade in one of the four 6th grade centers in the black area.

Street. The Ward 2 transferees were seventh and eighth grade pupils from the school in Poland, which was reduced to a K–6 facility. 11th Ward transferees included seventh and eighth grade pupils from the town of Buckeye, three of whom would become involved in further orders. An earlier version had closed the junior high school in Tioga, but the court reconsidered and rejected that determination in formulating its final plan. It noted that "[A]lthough this plan . . . has deficiencies, it is far better than any of the alternatives suggested. It relieves Tioga of the inequities of the original and spreads the burden of busing far more evenly in other areas." Enrollment figures reveal that these orders were effective, though attainment of projected totals was somewhat frustrated by "white flight".[4]

The remainder of the court's plan affects schools in the southeastern portion of the parish, in Wards 3, 2, and 4. Before promulgation of the plan the Ward 3 town of Lecompte contained three schools, Lecompte Elementary, Carter Raymond, and Rapides High School. Lecompte Elementary and Carter Raymond each served pupils in grades K–8 under earlier orders. Each school had a majority of black pupils in the range of approximately 60 per cent. The Lincoln Williams School in Cheneyville, some 10 miles to the southeast of Lecompte, served all area pupils in grades K–8. The school was, as noted above, approximately

93% black, and is the "spur" for additional relief in this area of the parish. About the same distance to the west of Lecompte is the community of Forest Hill, which contained a K–8 school with a black attendance percentage of only 8.3. High school students from both communities went on to Rapides High School in Lecompte. Northeast of Lecompte in Ward 2 is the community of Poland, which had a K–12 school with 9.6 percent black pupils in attendance.

The plan provided for Lecompte Elementary to become a K–3 facility, and for Carter Raymond to serve grades 4–8. Lincoln Williams was closed, and its K–8 pupils were transferred to the Lecompte schools. Forest Hill was also closed, with its pupils transferred to Lecompte Elementary and Carter Raymond. Pupils from the Poland School in grades 9–12 were shifted to Rapides High School. The variance between percentages of black attendance at these schools as projected by the district court and under actual 1980 enrollments is distinct.[5]

To summarize the cumulative effect of its plan, the court stated:

100% of the black student population in the parish will attend integrated schools for ten of the thirteen years of their education. 90.4% will attend fully integrated public schools for the entire thirteen years of their public education. Any

4. Junior high school reassignments altered the percentage of black pupils attending the five schools as follows:

| | % Black 1979–80 | Projected % Black 1980–81 | % Black Under Actual Enrollment, 1980 |
|---|---|---|---|
| Alexandria Jr. High | 43.7 | 42.5 | 42.7 |
| Brame Jr. High | 38.4 | 40.5 | 44.3 |
| Jones Street Jr. High | 93.3 | 42.6 | 52.3 |
| Tioga Jr. High | 2.5 | 40.9 | 42.8 |
| Pineville Jr. High | 13.7 | 41.9 | 43.7 |

5.

| | Grade | Projected % of Black Attendance | Actual % Enrolled |
|---|---|---|---|
| Poland Elementary | K–6 | 47.7 | 36.8 |
| Lecompte Elementary | K–3 | 45.3 | 63.9 |
| Carter Raymond | 4–8 | 47.5 | 61.9 |
| Rapides High | 9–12 | 41.1 | 43.7 |

As the school board notes, the variance reflects the fact that most of the Forest Hill pupils have left the public school system to avoid compliance with the district court's order.

one of the 9.6% may attend integrated schools for the entire thirteen years by exercising his right of transfer under the majority to minority rule. Thus all black students in the metropolitan area may attend integrated public schools for the entire thirteen years of their public education if they wish to do so. 100% of the black students outside the metropolitan area are assigned to integrated schools for the entire thirteen years of their public education.

Aside from pupil reassignments, the court provided that principals of certain named schools be white, and of others, black. It reimposed a 31.5 *Singleton* ratio of faculty and staff, and additionally ordered that in each school "the assistant principal be of the race other than that of the principal of that school." The construction of new schools outside of the metropolitan areas was forbidden in the absence of express court approval. Finally, in a comment which should have served to warn those contemplating avoidance of the plan, the court stated "we shall use every means possible to assure that students in the system attend only those schools to which they have been assigned."

## POST–JUDGMENT PROBLEMS

Vociferous community resistance to the plan surfaced soon after its implementation, both in the southeastern portion of the parish, at Forest Hill, and in the northeastern community of Buckeye. Forest Hill residents had attempted to intervene on August 1, 1980, just before the date of final judgment, to complain of the closing of their school. They urged that previous pleadings and evidence had not given notice that the facility was in jeopardy. Intervention was denied by the district court as untimely.

After the plan was adopted and imposed for the 1980–81 school year, Forest Hill residents "quietly and peaceably" moved onto the closed school grounds and began to teach their children on the premises. The district court had previously issued an injunction against interference by school officials with implementation of the plan, but it does not appear that these residents acted in concert with school officialdom.

The government requested a temporary restraining order barring such use of the school. A hearing was held, after which the district court prohibited the residents from setting foot on the ten-acre school premises, on pain of a fine between $100 and $300 per day. This order was merged into a permanent injunction on September 22.

Matters became even more heated in the northern part of the parish, and centered around efforts of the parents of three former Buckeye students to thwart their transfer to the Jones Street School. The parents of Michelle LaBorde, Lynda McNeal, and Ramona Carbo sought relief from State District Judge Richard E. Lee of the Ninth Judicial District of Louisiana. They obtained orders awarding "provisional custody" of the girls to families living in the zone of Buckeye attendance.

The district court was apprised of these maneuvers, and wrote a letter to the school superintendent directing him to terminate the girls' enrollment at Buckeye until such time as they had obtained permission to transfer from a court-appointed transfer committee. The principal at Buckeye ordered them to leave the school.

The parents then jointly filed a petition for writ of mandamus and injunctive relief in the state court, docketed as *LaBorde, et al v. Waite* before Judge Lee. The United States District Court for the Western District of Louisiana was named a respondent. On November 3rd, Lee ordered school officials to allow the girls to attend Buckeye, and on November 6th, he temporarily enjoined United States District Judge Nauman Scott from issuing any order or decree "interfering with or tending to interfere with the administration of justice by the Ninth Judicial District Court of Louisiana . . . or the rights, privileges and immunities of petitioners as litigants [before that court]."

On November 6 the United States Department of Justice, as counsel for the United States District Court, filed a petition to remove *LaBorde v. Waite* to federal court. The petition was granted on the same day, and Judge Scott vacated Judge Lee's injunctions of the 3rd and 6th.

This action did not deter Judge Lee from issuing injunctions. On November 7, he enjoined Judge Scott from interfering with the attendance of the three children at Buckeye High School, and on November 14 he enjoined school officials from obeying federal court orders. On the same day, Judge Scott enjoined the parents, guardians, school officials and their attorneys from proceeding further in state court. He scheduled a show-cause hearing to determine why the girls' enrollment at Buckeye should not be terminated.

The hearing was held on December 3. Judge Scott ruled that the girls must attend school in compliance with the August 8 order until such time as permission to transfer was formally obtained, and refused to consider evidence concerning the status of their residence until applications for transfer had been filed. He then terminated their Buckeye enrollment, directed school officials to enroll them at Jones Street, and made permanent his injunction against further state court proceedings.

Once again, Judge Lee was not deterred. On December 4, acting *sua sponte*, he ordered Sheriff Marshall T. Cappel to accompany the girls to the Buckeye school and arrest anyone who attempted to interfere. Such persons were to be brought before him. To avoid a confrontation, school officials allowed the girls to stay in the school, but denied them credit until their assignment status was resolved.

Judge Lee then, on December 5, ordered the superintendent to afford credit to the girls, or, in the alternative, "to show cause why [he] should not be held in contempt of court and fine, jail sentence or both imposed."

The girls, continuing at Buckeye, filed the formal applications demanded by Judge Scott and he set a hearing for December 19.

Their counsel waived presentation of evidence, and the United States presented witnesses. Judge Scott found that the sole purpose of the custody proceedings was to evade the August 6 desegregation order. He ordered the principal to terminate the girls' Buckeye enrollment, but allowed him to give them credit for the time they had attended, provided that they enrolled at Jones Street after the Christmas recess. The parents, guardians, and school officials were advised that a penalty of $500 per day would be assessed against any person who violated these orders. Judge Scott took under advisement the government's motion for an injunction against the sheriff, denied the LaBordes' request for a stay, and vacated the state court orders of December 4 and 5. On December 23, the court filed a written opinion containing this injunction, and on December 29 amended it to include the sheriff. It also dismissed the state court suit which had been removed.

Judge Lee was not finished yet. On January 2, he ordered school officials to enroll the girls at Buckeye, and made them wards of his court to avoid "serious psychological and mental abuse." There followed a series of events which would resemble comic opera were it not for their unfortunate impact on the community. Three state troopers were sent with the girls to class at Buckeye on January 5. They ordered the principal to enroll them. On the same day, Judge Scott issued a temporary restraining order enjoining Louisiana, the state police, "and all persons with notice of this order" from enforcing the state court's orders or interfering with those of the district court issued August 6 and December 29. This was served on the Attorney General of Louisiana, the state police, and Judge Lee. On receipt, the state troopers withdrew from Buckeye. The next day, Judge Lee ordered the local constable to accompany the girls and enforce his order. He also withdrew after being apprised of the federal injunction.

Finally, with all state and local law enforcement authorities apparently complying with federal orders, Judge Lee personally

escorted the girls to class on January 7, 12, and 13, directing the principal to enroll them on pain of arrest. The principal complied. In the meantime, on January 7, Judge Scott ordered Judge Lee and the girls' parents to show cause why they should not be found in contempt of the injunctions issued December 29 and January 5.

On January 14, Judge Scott held a hearing on whether to convert his temporary restraining order of January 5 to a permanent injunction. Louisiana stipulated that it was binding on all state officials. The court then made the state and Judge Lee parties, and enjoined them from interfering with its orders and from enforcing any state court orders in *LaBorde v. Waite*. On the following day, a hearing was held on the show cause order. Judge Scott ruled that the government had presented a compelling prima facie case of contempt, and, after receiving assurances from Judge Lee and the other parties that they would comply with his orders, dismissed the contempt motions without prejudice. The court allowed the girls credit for the fall semester at Buckeye, conditioned upon their enrollment at Jones Street for the fall semester. It required that their transcripts be submitted to the court until they had complied. Since January 14, the girls have neither attended public schools in Rapides Parish nor agreed to enroll in Jones Street.

## ISSUES ON APPEAL

Eight separate appeals have reached us from the orders below. The Rapides Parish School Board appeals from the merits of the district court's August 6, 1980, final judgment. It asserts (1) that the school system was unitary in the 1979–81 years, obviating the need for further relief, (2) that if the system was not yet unitary, the remedy imposed improperly exceeded the scope of the violation, and (3) that in any event, the district court erred in ordering immediate implementation of the plan without giving the parties further time to arrive at a proper remedy.

The Forest Hill residents who had attempted to intervene appeal (1) from the denial of the intervention, and (2) from that portion of the August 6 order which closed the Forest Hill School, characterizing it as outside the scope of relief requested by the original parties. Forest Hill residents further appeal from the injunction which prohibited use of the closed school facility there, contending (1) that they were not in violation of the court's original injunction against official interference, (2) that a prerequisite showing of irreparable harm had not been made, (3) that the injunction exceeded the scope of relief requested, and (4) that it infringed their First Amendment rights to free speech and peaceable assembly.

The remaining appeals arise from the Buckeye furor. The parents of the three girls who attempted to evade Jones Street attendance challenge the injunctions issued by the district court to compel their compliance with its desegregation order. In particular, they maintain the invalidity of the district court's retention of the girls' transcripts pending compliance. The Rapides Parish sheriff, Marshall T. Cappel, appeals from the district court order prohibiting his interference with implementation of the desegregation orders. Finally, the State of Louisiana has appealed from those orders of the district court which enjoined the state and its officials from executing state court orders contravening those of the federal court, and argues that the federal court's retention of transcripts pending compliance violates fundamental rights to travel, to change residence, and parental rights to direct the upbringing and education of children.

## RESOLUTION

### I. The Merits of the Desegregation Order

In its appeal docketed here as No. 80–3722, the Rapides Parish School Board attacks both the district court's finding that supplemental relief was required and certain elements of the plan imposed. The board first contends that the "entire system as constituted prior to the imposition of this

plan was unitary." This contention is grounded on three basic assumptions. First, it is assumed that this court, by its last consideration of the case in 1970, held the system to be unitary with the exception of student assignments in Wards 1 and 8, "and possibly 3 and 4." Second, it is assumed that the one-race schools in the Alexandria Wards 1 and 8 area exist "solely because of the residential preference of the students and are not caused by any unconstitutional action by this school board." Third, it is assumed that the 93% black school at Cheneyville in Ward 3 owes its racial character to the unavoidable effect of "white flight" after earlier decrees had paired area schools.

[1, 2] We conclude that the district court correctly applied the appropriate legal standards in finding further relief to be necessary. In its 1970 opinion, *Valley v. Rapides Parish School Board, supra,* this court made no express or implied finding that any portion of the system was unitary; it merely affirmed those portions of the plan appealed from insofar as they did not deal with pupil transfers in the Alexandria wards. *See* 434 F.2d 144 and 145. If the district court later held other areas of the parish unitary under a plan not appealed from, that finding binds neither this court nor the court below. *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971), firmly established that the duty to eliminate *all* vestiges of state imposed segregation is *continuing.* A plan which gives promise of establishing a unitary system cannot foreclose further relief if it does not in fact abolish the evidences of segregation. In any case, only time will tell.

We cannot ignore the continued existence of one-race schools in this system. In *Swann,* the Supreme Court stated:

... in a system with a history of segregation the need for remedial criteria of sufficient specificity to assure a school authority's compliance with its constitutional duty warrants a presumption against schools that are substantially disproportionate in their racial composition ... [T]he court should scrutinize such schools, and the burden upon the school authorities will be to satisfy the court that their racial composition is not the result of present or past discriminatory action on their part. 402 U.S. 1 at 26, 91 S.Ct. 1267 at 1281, 28 L.Ed.2d 544 at 572.

This principle has been consistently applied. *See, e. g., Anderson v. County Board of Education,* 609 F.2d 225 (5 Cir. 1980); *United States v. Board of Education of Valdosta,* 576 F.2d 37 (5 Cir. 1978); *Boykins v. Fairfield Board of Education,* 457 F.2d 1091 (5 Cir. 1972).

We must also reject the school board argument that the existence of these schools is justified by demographic facts regarding residential patterns in Alexandria. Only last year, in *Lee v. Macon County Board of Education,* 616 F.2d 805 (5 Cir. 1980), we held that "[N]ot until all vestiges of the dual system are eradicated can demographic changes constitute legal cause for racial imbalance in the schools." 616 F.2d 805 at 810. *See also Valdosta, supra; Flax v. Potts,* 464 F.2d 865 (5 Cir. 1972). As the figures set out in note 2, *supra,* reveal, these schools have never been desegregated. In the same sense, their composition may not be justified by pointing to "white flight" as a permissible causative to continued imbalance. If such a factor renders a plan unworkable, the district court may attempt another solution, but we will not allow desegregation to be thwarted by extra-legal action.

Against this legal backdrop, the maintenance of the all-black schools described *supra* from 1965 through the spring of 1980 is glaring, and clearly requires further relief. We now turn to an examination of the plan drawn by the district court.

The appellant school board contends that if further relief was indeed required, the district court's remedy was excessive. First, the board argues that the plan improperly orders changes in areas of the parish which were not put in issue by motions, and where the schools involved have previously been declared unitary. It is maintained that "[T]he motion of the United

States in Wards 1 and 8, and the plan proposed by their expert, under limiting directions from the government, involved only schools in Wards 1, 8, and 9. Although plaintiff's motion originally rather vaguely referred to all schools in the system, plaintiffs never submitted a plan involving schools in other wards to the court and affirmatively adopted the plan proposed by the government."

Secondly, the board urges that the court erred in failing to accord the same recognition to "neighborhood" or community schools in the rural areas of the parish as it did in the metropolitan zone. It asserts that the holding that no neighborhood schools exist in rural areas was "a fundamental error of fact which led the district court into improperly rearranging the schools, and students, in Cheneyville, Poland, Lecompte, Forest Hill, Ruby Wise, and Buckeye areas, including the closing of Forest Hill."

Finally, the board complains that immediate implementation of the plan prevented the formulation of a proper remedy, and left no time for planning or efforts to convince school patrons that the plan would not adversely affect their children.

Having carefully studied the plan, we are convinced that the district court performed admirably in most respects. It must be remembered that the school board did not propose any plan of its own, and that the private plaintiffs merely adopted a government plan which the court deemed inadequate. Given this level of guidance from the parties, the plan is a remarkably well-considered response to a difficult set of problems.

■ The fashioning of relief in a school desegregation case is an exercise of the district court's discretion in creating an equitable remedy as a response to the denial of constitutional rights. Where the local school authorities have failed to remedy past wrongs, the power of the district court is broad. *Swann, supra,* 402 U.S. 1, 15, 91 S.Ct. 1267, 1275, 28 L.Ed.2d 554, 566. "The task is to correct, by a balancing of the individual and collective interests, the con-

dition that offends the Constitution." *Id.,* 402 U.S. 1, 16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554, 566. The criterion for determining the validity of provisions in a desegregation plan is whether they are reasonably related to the ultimate objective. *U. S. v. Jefferson County Board of Education,* 372 F.2d 836 (5 Cir. 1966).

■ In considering these measures, the district court properly viewed the system as a whole, rather than limiting its consideration to the racial imbalance of isolated schools in the system. *Lee v. Macon City Board of Education, supra.* The entire parish operated as a dual, segregated system in the past, and statistics show that the vestiges have not been eradicated "root and branch" as required.

■ We must reject any contention that the movants below waived a remedy going beyond Alexandria and its immediate environs. The government points out in its brief that it was only logical to concentrate on discussion of problems in Alexandria, where most of the one-race schools were located. At the April hearing, the government expressly reserved its right to seek desegregation outside of Alexandria. The private plaintiffs initially sought desegregation of every racially identifiable school in the parish, and, when they endorsed the Foster plan, renewed their request for a system-wide remedy. It should finally be noted that at the same hearing, counsel for the school board commented on the Foster plan as follows:

Why didn't you come prepared to deal with the whole system, is what I don't understand. If you are not able to say now that what you propose will convert us to a unitary school system, why didn't you go ahead and include everything that will convert us to a unitary school system, because that is what you say we have got to do.

■ We perceive no serious objection to that portion of the plan concerning elementary school pupils in Alexandria. The cluster units are well conceived, and achieve a proper balance between competing consid-

erations. Desegregation is achieved within school groupings which do not require long-distance transfer. Further, it is apparent from the fall, 1980 enrollment statistics quoted above that the plan is indeed showing promise of success as intended.

Serious objections are raised, however, to those portions of the plan which are aimed at the desegregation of Alexandria area junior high schools and schools in the southeastern wards of the parish. Not surprisingly, these are the provisions requiring some degree of inter-community pupil transfer. The objections revolve around the importation of junior high school pupils from Wards 2 and 11 into Alexandria, and the closure of rural schools at Forest Hill and Cheneyville. Specific findings were made to justify these orders, and we must determine whether the district court abused its discretion in fashioning the relief complained of.

The appellants contend that the district court erred in failing to accord the same respect to neighborhood schools in rural areas as to those in Alexandria; the comment that there can be no rural neighborhood schools is cited as an example of this asserted misconception. We agree that the comment, taken in its absolute context, is clearly erroneous. A review of case law concerning the neighborhood school concept will reveal that it should apply equally to metropolitan and rural facilities.

■ We have recognized that "[U]sually, in rural and some city school districts where the population is diffused, assignment on a strict neighborhood basis has been sufficient to eliminate discrimination in student assignments." *Cisneros v. Corpus Christi Independent School District*, 467 F.2d 142, 152 (1972). It has consistently been held, however, that if such measures prove inadequate to the task of eradicating all vestiges of a dual school system, "[A] district court

may and should consider the use of all available techniques including the restructuring of attendance zones and both contiguous and noncontiguous attendance zones." *Davis v. Board of School Commissioners*, 402 U.S. 33, 37, 91 S.Ct. 1289, 1292, 28 L.Ed.2d 577, 581 (1971). We reject any argument that urban and rural facilities within a single school district which operated as a dual system and has not yet achieved unitary status may not, as a matter of law, be paired or clustered together.

■ In formulating such a plan, it is clear that bus transportation may be utilized. The Supreme Court long ago ruled that there is "no basis for holding that ... school board authorities may not be required to employ bus transportation as one tool of school desegregation." *Swann, supra*, 402 U.S. 1, 30, 91 S.Ct. 1267, 1283, 28 L.Ed.2d 554, 575. It is also clear that in its formulation of noncontiguous zones, pupil reassignments within them, and transportation to effectuate the reassignments, the district court should take into consideration such equitable factors as "[T]he length and time of travel ... in light of the age of the children, and the risk to health and probable impingement on the educational process." *Cisneros, supra*, 467 F.2d 142 at 153. These considerations are equally applicable to rural and metropolitan schools.

As to the more intangible values associated with the neighborhood school concept, there should be no urban-rural distinction. We recognize that rural schools may, as the appellants contend, serve the same community function and implicate the same values as those in urban zones. We are told that since the days of the one-room red-brick schoolhouse, life in rural communities has frequently revolved in large measure around the local school, which may be the only cohesive element to cement dispersed residents into a community.[6] This may well

6. Certain of the appellants have urged us to hold that there is a fundamental right to maintain a rural society separate and apart from the urban environment; it is said to emanate from fundamental principles "beyond the constitution." While doubtless, the choice of rural residence and lifestyle enjoys the protection of express and implied constitutional guarantees, there is no broad, ephemeral right to a separate rural life which will defeat the otherwise valid orders of a district court in furtherance of the long-recognized constitutional mandate to desegregate.

be true, and such considerations are not without importance. They are, however, even more yielding than practical variables such as proximity when posed against the continuing need to achieve meaningful desegregation. In *Keyes v. School District No. 1, Denver, Colorado*, 521 F.2d 465 (1975), *cert. denied*, 423 U.S. 1066, 96 S.Ct. 806, 46 L.Ed.2d 657 (1975), the Tenth Circuit noted the importance of neighborhood contact in such areas as the playground, extracurricular activity, and parental involvement, but cogently observed that "we cannot place it above the constitutional right of children to attend desegregated schools." 521 F.2d 465 at 478.

 Further, we see no reason for a general distinction between urban and rural facilities as regards the closing of schools pursuant to a plan for desegregation. The closing of a facility built and maintained at the expense of local taxpayers is a harsh remedy, which should only be employed if absolutely necessary to achieve the goal of a unitary system after all other reasonable alternatives have been explored. Where a district court adopts such a measure, the inquiry before us is whether the order was an abuse of discretion. *See Ellis v. Board of Public Instruction*, 465 F.2d 878, 880 (5 Cir. 1972). The district court must explicitly state its justification for ordering a school closed, in order that we may properly make this determination.

 Applying these principles to the order before us, we find those regarding Alexandria Junior High Schools to have been within the bounds of discretion. The unyielding racial character of the Jones Street School was the worst problem confronting the court. Specific findings were made to justify the reassignment of pupils from Wards 2 and 11 to that facility, and it appears that reasonable alternatives were fully explored. Participation of pupils from Buckeye and other areas of Wards 2 and 11 was justified on the following grounds:

Although this parish first encountered integration problems in 1965, and has had an active history of integration endeavor since that time, the Buckeye schools have shouldered no responsibility. Out of a combined population of 1306 students, 87 are being assigned to Jones Street. They, like all the other students so assigned are already bused, their buses simply are being turned in another direction. They are the students in each ward that are nearest to Jones Street. We find this alternative to be the most equitable at our disposal.

Intercommunity busing into Alexandria does not begin until the seventh and eighth grades, and involves only 205 pupils under plan projections. We discern no basis for concluding that the district court's comment regarding rural neighborhood schools reflected an improper disregard of equitable consideration in constructing these zones of transfer; rather, it appears that the court properly balanced the relevant competing considerations. We therefore leave undisturbed those portions of the order involving northeastern Rapides Parish.

 We cannot lend our sanction so easily, however, to those portions of the plan involving pupils and facilities in Wards 3 and 4. Here, as we have described, the district court elected to close a predominantly white rural school, Forest Hill, and a predominantly black school, Lincoln Williams, equidistant in different directions from the town of Lecompte, and to transfer their pupils to Lecompte schools. As far as we can determine, the only justification for closing Lincoln Williams was its predominance of black pupils. The court admitted that Forest Hill is more modern than Lecompte Elementary, but described the latter as having "much the better location for purposes of integration," in terms of distance for busing of reassigned pupils. Alternatives are only sparingly mentioned.

These findings are an insufficient factual basis on which to approve the closing of Forest Hill and Lincoln Williams. Equally effective alternatives may exist which would avoid the closing of a modern facility

and the intercommunity transfer of kindergarten pupils. These should be explored on remand and, if the district court adheres to its present plan, specific reasons for their rejection should be given. We cannot ignore the district court's disregard of neighborhood considerations for rural schools in this context, particularly where K–2 students in Alexandria were spared transfer to the point that three schools remain virtually all-black. Specific desegregation measures in southeastern Rapides Parish should be re-examined in light of the full range of mitigating equitable considerations.

▇▇ In passing on objections to the merits of the district court's plan, we are left with the school board's argument that the court's order requiring immediate implementation only days before the fall term was to begin constituted an abuse of discretion. We flatly reject such a contention.

As counsel for the school board are no doubt aware, the Supreme Court has repeatedly and firmly declared that school systems must begin to operate immediately on a unitary basis and that requests for delay must be viewed in light of the passage of time since the inception of desegregation efforts. "The burden on a school board today is to come forward with a plan that promises realistically to work, and promises realistically to work now." *Green, supra,* 391 U.S. 430, 439, 88 S.Ct. 1689, 1694, 20 L.Ed.2d 716, 724. The operative word is *now. See also Wright v. City Council of Emporia,* 407 U.S. 451, 460, 92 S.Ct. 2196, 2202, 33 L.Ed.2d 51, 60 (1972); *Swann, supra,* 402 U.S. 1, 13, 28 L.Ed.2d 554, 565, 91 S.Ct. 1267, 1275 (1971). *Alexander v. Holmes County Board of Education,* 396 U.S. 19, 20, 90 S.Ct. 29, 24 L.Ed.2d 19, 20 (1969); *Dowell v. Board of Education,* 396 U.S. 269, 270, 90 S.Ct. 415, 416, 24 L.Ed.2d 414, 416 (1969); *Bradley v. School Board,* 382 U.S. 103, 105, 86 S.Ct. 224, 225, 15 L.Ed.2d 187, 189 (1965); *Rogers v. Paul,* 382 U.S. 198, 199, 86 S.Ct. 358, 359, 15 L.Ed.2d 265, 267 (1965).

In the case *sub judice,* sixteen years of litigation have not achieved the goal of a unitary system. Further, we note that the school board did not aid the district court by proposing specific remedial measures, having had the opportunity to do so long before the beginning of the 1980 term. Finally, there has been neither a showing nor even an allegation of harm resulting from the court's implementation order sufficient to underly a finding that discretion was abused.

II. Intervention by Forest Hill Residents

By the appeal docketed here as No. 80–3855, residents of the town of Forest Hill challenge the denial of their intervention into this suit, attempted after the district court's plan had been originally proposed. The appellants claim entitlement to intervention as a matter of right under Fed.R. Civ.P. 24(a)(2), and assert that permissive intervention was proper under section (b)(2) of that rule. They claim that no notice had been given them from pleadings or proceedings that their school would be affected until after the district court issued its plan, and assert that no prejudice to other parties would result from their intervention.

▇▇ These arguments run afoul of a series of cases decided by this court regarding intervention under Rule 24 in desegregation cases. Clearly, the appellants were not entitled to intervene as a matter of right. In *United States v. Perry County Board of Education,* 567 F.2d 277, 279 (5 Cir. 1978), we held for the first time that "parents seeking to intervene [in desegregation cases] must demonstrate an interest in a desegregated school system," and affirmed the district court's denial of intervention on the ground that the movants were attempting to *challenge* elements of the plan. This position was reaffirmed in *Pate v. Dade County School Board,* 588 F.2d 501 (5 Cir. 1979), where it was held that parents opposing facets of a desegregation plan have no right to intervention under Rule 24(a)(2), and that "[T]he parental interest that justifies permissive intervention is an interest in a desegregated school system." 588 F.2d 501 at 503.

▇▇ Even if we were to assume that the appellants stated a judicially cognizable

interest by opposing the desegregation plan, it is clear that the district court did not abuse its discretion by denying the motion. Under our decision in *Hines v. Rapides Parish School Board*, 479 F.2d 762 (5 Cir. 1973), intervention may be denied where existing parties to a lawsuit have advanced the position which intervenors seek to promote, or where the district court has already considered and passed on that matter; here, the school board opposed the closure of the Forest Hill facility, and the district court considered and rejected its argument. Concluding that the denial of intervention was proper, we do not address the appellants' specific arguments with regard to the closing of Forest Hill School.

### III. The Injunction Against Use of Forest Hill School

By the appeal docketed as No. 80–3776, residents of Forest Hill challenge the district court's permanent injunction of September 22, 1980, which prohibited any use of the Forest Hill School grounds. A number of arguments are advanced toward showing the invalidity of this order, as noted *supra*.

We will not, however, discuss those assertions in detail. We realize that the district court was faced with what clearly appears to have been an organized move to thwart its orders when residents began to teach children at the closed facility. An evidentiary hearing was held before the injunction issued, at which Forest Hill parents testified that they had been present at the school, and, with full knowledge of the court's order of closure, deliberately disobeyed it. On the other hand, while action was necessary, the district court was also required to observe the principle that an injunction is to be narrowly tailored to remedy the specific action which gives rise to it. A total prohibition on the use of a modern facility which could serve many community purposes other than the teaching of children seems extremely broad.

In any event, we conclude that it is appropriate for the district court to resolve

this dispute, if application for relief from the order is made to it following remand of the cause. The lower court is in a far better position than this tribunal to balance the competing interests involved.

### IV. Appeals From the Buckeye Dispute

The remaining appeals[7] are from orders issued by the district court to protect the integrity of its desegregation plan following an attempt by three pupils to enroll in a junior high school other than that contemplated by the plan. Among the most unfortunate occurrences in the long history of school desegregation have been the employment of various legal devices to thwart realization of the ultimate goal, whether for an entire system or for particular pupils. Here, a novel scheme was hatched with the aid of a state trial judge: the transfer of custody for three girls to residents of a zone which permitted attendance at the school to which they had previously been assigned.

At the outset, we must restate several fundamental propositions which the parents involved and their counsel have chosen to overlook. First, a federal court has the power to root out all vestiges of state-sponsored segregation where school authorities have failed to do so. *Swann, supra*. This broad power undoubtedly includes the authority to rearrange attendance zones and supervise student transfer policies. *Id.* We have held that in the case *sub judice*, the remedial power of the district court was invoked by a finding that this system was not unitary, and we have upheld those portions of the plan involving junior high school attendance zones.

While it has long been held that parents have a right to direct the education of their children, *Pierce v. Society of Sisters*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925), such a right does not give them the unqualified authority to choose a particular public school. A federal district court's desegregation order will bind the children affected, their parents, and state and local officials. *United States v. Hall*, 472 F.2d 261 (5 Cir. 1972).

---

**7.** These are docketed as numbers 80–3988, 81–3008, 81–3013, 81–3033, and 81–3083.

We will first take up the district court's orders regarding actions by the state court and the litigants before it. We find the district court to have acted properly in removing the state case to federal court, in vacating the state judge's orders afterward, and in the exercise of its jurisdiction and injunctive power as to the state court and litigants.

There is absolutely no ground suggested to us or discernable in the record on which we could find clearly erroneous the district court's conclusion that these custody transfers were a sham intended to avoid the effect of the desegregation orders. Clearly, that is what occurred. One of the witnesses presented by the government at the hearing on this matter was a school bus driver. He testified that Ramona Carbo was picked up at her parents' home on Monday and Thursday mornings, and was returned there on Wednesday and Friday afternoons. This finding alone is sufficient to dispose of the argument that matters of juvenile custody are reserved to the state courts; if the sole purpose of a state judicial order is to thwart the vindication of a federal constitutional guarantee, we will pierce the veil of sham to prevent pretextual disregard of valid remedial orders.

It is also clear that the district court properly exercised its power under 28 U.S.C. § 1442, in removing the state case to federal court where the court was named as a defendant, and that the court had broad power under the All Writs Act, 28 U.S.C. § 1651 to enjoin third parties, *including state courts*, from interfering with its desegregation orders. *See Cooper v. Aaron*, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958); *United States v. Hall, supra*; *United States v. State of Texas*, 356 F.Supp. 469 (E.D.Tex. 1972), *aff'd*, 495 F.2d 1250 (5 Cir. 1974).

The district court acted with both dispatch and prudence in fashioning its injunctions against the state court, parents, and pupils involved. After resistance had come to a head and then collapsed, the court did not impose a penalty upon Judge Lee, but accepted a promise to avoid further interference. This was an act of no little toler-ance where the state court caused several third parties, most notably school officials, to be faced with conflicting orders from state and federal courts. The district court obviously, in all of these orders, kept in mind the principle that "state policy must give way when it operates to hinder vindication of federal constitutional guarantees." *United States v. Scotland Neck City Board of Education*, 407 U.S. 484, 488, 92 S.Ct. 2214, 2216, 33 L.Ed.2d 75, 80 (1972).

Finally, it is noteworthy that the state judge's actions appear to have no basis in Louisiana law. Article 220 of the Louisiana Civil Code, which we are told was the authority for Judge Lee's ruling, is designed to be used primarily as authority for a teacher to discipline students placed under his or her care. We are unable to find any mention of a "provisional custodian" in the context used by Judge Lee under Louisiana statutes or case law. It is further apparent that the state judge either ignored or was ignorant of the holding of the Louisiana Supreme Court in *Swope v. St. Mary's Parish School Board*, 256 La. 1110, 241 So.2d 238 (1970):

> Our Court system should not be used as an instrument to circumvent orders and decrees of a Federal Court in a controversy in which the latter has already asserted its jurisdiction. Any other course, if pursued regularly, will set the State and Federal Courts into continuous and chaotic conflict; and it will place litigants as well as the District Judges of this State in an obviously untenable, if not impossible, position, such as would result in the present case if we were to order the [State] District Judge herein (and ultimately the defendants) to defy the presently existing orders of the Federal Court. 241 So.2d 238 at 242.

As Judge Lee flagrantly disobeyed the orders of a federal court issued within the bounds of jurisdiction and discretion, ignored the distinct contours of federal and state jurisdiction, disregarded the clear command of his own State Supreme Court, and blatantly overstepped his judicial role as mediator, choosing instead to act as ad-

vocate for a politically popular position, it is not at all strange that he wound up as a leader without troops, standing ineffectually at the school house door.

■ The injunctions lodged against the Rapides Parish sheriff and the state of Louisiana must also be affirmed. As we have noted, the decision of the Supreme Court in *Cooper v. Aaron, supra,* renders it clear that state officials are bound through the supremacy clause by a federal court's desegregation order, regardless of whether they acted in good faith or pursuant to a nondiscretionary duty.

■ Of all of the orders issued by the district court during this period, only one requires correction on remand. Insofar as the court's order retaining the girls' transcripts pending enrollment in compliance with the plan operates to restrain them from choosing to attend a private school, it must fail. In *Pierce v. Society of Sisters, supra,* the Supreme Court established the existence of a right to attend non-public schools as a concomitant of "the liberty of parents and guardians to direct the upbringing and education of children under their control." 268 U.S. 510, 534–35, 45 S.Ct. 571, 573, 69 L.Ed.2d 1070, 1078. The retention of transcripts could also be viewed as an impermissible restraint on the constitutional right to travel, if a decision were made to send the girls to schools outside of Rapides Parish. If these three pupils choose to attend Rapides Parish public schools, they may be ordered to attend that school assigned them under the plan and their transcripts may be withheld until compliance, within the discretion of the district court. No such action, however, may be taken to compel their attendance at public schools, and no penalty may be attached to a decision not to do so.

## CONCLUSION

Thus is concluded another chapter in the history of Rapides Parish desegregation litigation. On the whole, the history is a story of both tragedy and hope. Tragedy lies in the fact that sixteen years have not been sufficient to eradicate the vestiges of segregation, and that after the passage of so many years, certain elements of the community, including a member of the state judiciary, are evidently willing to hinder the task and are unwilling to bear any sacrifice. Hope lies in the real possibility that the plan instituted by the district court in 1980, together with whatever modifications the district court may implement on remand, will finally result in the establishment of a unitary system.

Several important lessons may be learned from the course of this litigation to the present. One is that resistance will be perpetually fruitless. The remedies afforded by the law to those who feel aggrieved by their burden under a desegregation plan are a request for reconsideration by the district court and appeal if it is refused. Defiance is the worst possible course, for the second lesson is that such efforts along with more subtle attempts to thwart the progress of desegregation will only prolong the process and possibly increase the burdens on all involved. Federal courts with continuing jurisdiction over desegregation efforts will not ignore the task entrusted to them by the Constitution and laws.

If all parties and affected persons will work together in good faith, progress toward a unitary system can be smooth and speedy. If maximum input and guidance are given a district court engaged in the formulation of relief, the plan emerging will necessarily be more equitable than one devised in an atmosphere devoid of cooperation. What all parties to this suit should bear in mind, is that when a unitary system is achieved, litigation will end and full attention may be returned to the business of educating children in the best way possible. The words used by the Supreme Court to conclude its opinion in the *Swann* case are instructive:

At some point, these school authorities and others like them should have achieved full compliance with this Court's

decision in Brown I. The systems would then be "unitary" in the sense required by our decisions in *Green* and *Alexander.*

It does not follow that the communities served by such systems will remain demographically stable, for in a growing, mobile society, few will do so. Neither school authorities nor district courts are constitutionally required to make year-by-year adjustments of the racial composition of student bodies once the affirmative duty to desegregate has been accomplished and racial discrimination through official action is eliminated from the system. This does not mean that federal courts are without power to deal with future problems; but in the absence of a showing that either the school authorities or some other agency of the state has deliberately attempted to fix or alter demographic patterns to affect the racial composition of the schools, further intervention by a district court should not be necessary. 401 U.S. 1, 32, 91 S.Ct. 1267, 1284, 28 L.Ed.2d 554, 575-78.

The judgment of the district court is affirmed in part, reversed in part, and remanded for proceedings consistent with this opinion. The plan imposed by the district court will remain in full force until such time as it may be amended below.

AFFIRMED IN PART and REVERSED IN PART; REMANDED.

