John **ROBERTSON** et al., Plaintiffs-Appellants,

v.

**NATCHITOCHES PARISH SCHOOL BOARD** et al., Defendants-Appellees.

No. 30031.

United States Court of Appeals, Fifth Circuit.

Aug. 31, 1970.

Jack Greenberg, Margrett Ford, Norman J. Chachkin, New York City, Jesse Stone, Shreveport, La., A. P. Tureaud, New Orleans, La., for plaintiffs-appellants.

Ronald C. Martin, Dist. Atty., Natchitoches, La., for defendants-appellees.

Before WISDOM, COLEMAN and SIMPSON, Circuit Judges.

COLEMAN, Circuit Judge:

The establishment of a unitary school system in Natchitoches Parish, Louisiana, was before this Court en banc sub nom. Hall v. St. Helena Parish School Board, 5 Cir., 1969, 417 F.2d 801. We there required the submission and implementation of a plan which would achieve unitary results.

Without detailing the proceedings which have since taken place in the District Court, the present appeal is from a judgment dated June 1, 1970.

The Natchitoches Parish School system includes all schools in the parish, including the City of Natchitoches. The parish is approximately 44 miles long from North to South and has a width of 35 miles from East to West. It covers 1,297 square miles and is one of the largest parishes in the State. It is bisected or "cut up" by the Red River and numerous lakes formed from old beds of the river. Many areas are heavily forested and sparsely populated.

In the 1,157 square miles situated outside the City of Natchitoches, there are 2410 white school pupils and 2295 Negro pupils. In the City of Natchitoches there are 2,056 white pupils and 2,101 Negro pupils.

When we remanded the case in 1969 a bi-racial committee was formed. This committee filed written recommendations with the District Court. The desegregation plan approved by the Court was also approved by the bi-racial committee, ex-

cept that the Court ordered more extensive pairing of schools than the committee had recommended.

HEW filed a proposed plan for 1969–1970. There were subsequent negotiations in depth with the Natchitoches Parish School Board, resulting in several changes in the HEW position. The HEW team had spent two days in this extensive parish. At the hearing the District Judge stated that "The HEW plan is frankly, in this Court's judgment, completely unworkable and impractical". In any event there was no current HEW plan in 1970.

Although the Parish School Board governs all schools in the parish, both inside and outside the city, we believe a logical consideration of the plan now before us would best be promoted by separately examining the city schools (Ward 1) and the rural schools (Wards 2 through 10). The testimony shows that the wards were established long prior to the *Brown* decisions of 1954 and the record indicates no racial factors in the establishment of the ward lines.

The Court approved plan included a majority to minority transfer provision, although it did not contain the absolute priorities more recently ordered by this Court.

## I
## THE CITY OF NATCHITOCHES
### *(Ward 1)*

The projected racial composition of the student bodies in the city is as follows:

| School | | White | Negro |
|---|---|---|---|
| North Natchitoches, | 1–6 | 416 | 400 |
| Northwestern Elementary, | 1–6 | 166 | 159 |
| Parks, | 1–6 | 249 | 239 |
| Weaver, | 1–6 | 249 | 239 |
| East Natchitoches, | 7–8 | 148 | 142 |
| Northwestern Jr. High, | 7–8 | 219 | 211 |
| Natchitoches Central, | 9–12 | 609 | 711 |
| | | 2,056 | 2,101 |

No student body within the city will be racially identifiable and the plan for

---

the city obviously meets all requirements in this regard.

## II
## THE SCHOOLS OUTSIDE THE CITY

We now examine the effect and results of the plan as applied to the rural areas, as exemplified by the following table of projected pupil attendance for the 1970–1971 school year.

*WARD 2. 320 square miles.*[1]

| | |
|---|---|
| Ashland, K-12 | 168 white, 68 Negro |
| Goldonna, K-12 | 271 white, 90 Negro |

The distance from Ashland to Goldonna is 23 miles. The pupil population of this ward is less than two per square mile. Much of the ward is occupied by Kisatchie National Forest. The school formerly at Reidheimer-Creston with 66 Negro students was closed in 1969. The two remaining schools are zoned by a line approved by the bi-racial committee.

*WARD 3. 102 square miles.*

| | |
|---|---|
| Fairview-Alpha, K-12 | 222 white, 7 Negro |

This ward is bisected by Red River. There are no bridges. Only those pupils residing North or East of the river attend Fairview-Alpha. This school has an excellent physical plant but is immediately adjacent to the parish boundary, on the North side of the ward.

*WARD 4. 287 square miles.*

| | |
|---|---|
| Campti Elementary, K-6 | 184 white, 167 Negro |
| Campti High, 7-12 | 153 white, 139 Negro |

These schools were paired, although the bi-racial committee recommended that only two elementary grades be paired. Clarence, with 196 Negro students and 67 white students in 1969–1970, was closed.

*WARD 5. 225 square miles.*

| | |
|---|---|
| Allen, K-12 | 25 white, 465 Negro |
| Marthaville, K-12 | 338 white, 35 Negro |

The white children assigned to Allen in 1969–1970 withdrew from the public

---

1. The square mile area figure is obtained by multiplying the length of the ward by the width. The figures are not the result of a metes and bounds survey.

school system. These schools are twelve miles apart. Total student capacity at Allen is 575–690, at Marthaville, 500–600, with a total capacity of 1075–1290 to accommodate 863 students.

*WARD 6. 156 square miles.*

Robeline, K-12        273 white, 125 Negro

Shady Grove, which had 84 Negro students in 1968–1969 was closed.

*WARD 7. 240 square miles.*

Provencal, K-12        313 white, 50 Negro

Much of this ward is occupied by the Kisatchie National Forest and has less than two pupils per square mile.

*WARD 8. 200 square miles.*

Gorum, K-12        227 white, 0 Negro

This ward runs across the entire South side of the parish, with about one pupil per square mile. No Negro families reside in this ward.

*WARD 9. 168 square miles.*

Natchez, K-6        0 white, 279 Negro
St. Matthews, K-12        0 white, 531 Negro

Many of the children in this ward attend parochial school. The St. Matthews school has an excellent physical plant. The area is inhabited largely by mulatto people, who are opposed to giving up their school, according to the undisputed evidence.

*WARD 10. 216 square miles.*

Springhill, K-6        115 white, 191 Negro
Cloutierville, 7-12        123 white, 148 Negro

Both schools were formerly K-12, one all black and one all white, and were paired to attain the above results.

## III

### RESULTS ACHIEVED

The 4157 students in the City of Natchitoches will attend seven schools, all free of racial identification.

In the rural areas, dispersed over an area of 1157 square miles, interspersed by a major river, lakes, and National Forests, four schools have been paired and three schools have been closed in an effort to bring the system in compliance with the Constitution. The process has had the active participation and approval of a bi-racial committee. Fourteen rural schools remain, a little more than one school per hundred square miles. The student bodies of the following schools are not racially identifiable: Ashland, Goldonna, Campti Elementary, Campti High, Robeline, Provencal, Springhill, and Cloutierville.

Fairview-Alpha is (but for seven students) all white. This school is cut off by the Red River, so the composition of the student body is caused by immutable geography, not racial reasons. There is no good cause for doing away with a good school plant.

In Ward 5, Allen is almost all black and Marthaville is nearly all white. These schools are twelve miles apart. HEW proposed that Marthaville be grades, 1–4, Robeline be grades 5–8, and Allen be grades 9–12. The parish asserts that HEW later agreed to leave Robeline intact (closing Shady Grove) and that Marthaville and Allen be operated as neighborhood schools. A zone line between Allen and Marthaville, recommended by the bi-racial committee, was established. It failed, however, because the white students assigned to Allen withdrew from the public school system. Theoretically, these schools could be paired. A good look at the map indicates the great distance children would be compelled to travel to effectuate the criss-cross between the two plants. Marthaville is in the extreme southwest corner of the ward, about two miles from both the South and the West boundaries of the parish. Neither plant has the capacity to handle all the pupils in the ward. If Allen were closed the burden of the long distance travel would fall almost altogether on the Negro children who now conveniently attend Allen. Moreover, all the children would have to travel to the extreme southwestern corner of the ward. This Court, of course, cannot alter geography. There

might be some other plan, however, which would work within educational realities, such as a subzone. We shall direct another effort in Ward 5.

This brings us to Gorum, all white, in Ward 8. This ward is hemmed on three sides by the parish boundaries. No Negro families live in the ward. It has 227 pupils in a 200 square mile area. This is a classic example of the situation encountered by a panel of this Court in Pate v. Dade County School Board, 5 Cir., 1970 [Nos. 29,039 and 29,179, August 12, 1970] in which the Court was compelled to hold that there simply was no practical way to desegregate several schools because of their peculiar geographical location.

We next encounter Natchez and St. Matthews in Ward 9. HEW agreed that St. Matthews be continued as a High School. This is the school where there is an excellent physical plant and many of the patrons are mulattos who do not wish to give up their school. The record shows that the mulattos once had the school as their own but more recently individuals of a higher percentage of Negro blood have been included, with the result that the student body is now counted as all black. This, of course, is an unusual situation. HEW did not wish to interfere with St. Matthews, the School Board did not wish to do so, and the plaintiff-appellants do not suggest that we do so.

HEW did recommend that Natchez be paired across the zone lines with Provencal in Ward 7. We see from the map that there is no road directly connecting these two schools. Yet, a fresh study might produce a realistic solution for the situation at Natchez. As in Allen and Marthaville we shall direct that such action be taken. Further study should be given to the practicability of pairing the schools in Ward 9 with those in Ward 7, at Provencal or with those in the City of Natchitoches.

## CONCLUSION

■ We, of course, must appraise the school system as a whole, Green v. County School Board of New Kent County, 1968, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716.

■ Were it not for the problems at Allen, Marthaville, and Natchez, attended by 779 Negro students in the rural areas of the parish, we could confidently adjudicate the existence of a unitary system in Natchitoches Parish. Such a pronouncement may yet be required by inescapable factors not reasonably subject to adjustment by the school board or the courts. We are of the opinion, however, that a genuine effort must first be made to improve the non-racial identification of these schools. This effort should be made, in depth, with due regard for educational realities, by HEW, the Parish School Board, and the bi-racial Advisory Committee, the results to be submitted to the findings and appraisal of the District Court, consistently with the Constitutional principles involved.

In view of the obvious difficulties to be encountered, the impending opening of the schools, and the progress already attained toward the accomplishment of a unitary system in Natchitoches Parish, we retain jurisdiction of this appeal and remand the case to the District Court with directions that the parish schools be operated under the existing plan for the first semester of the 1970–1971 school year. See Calhoun v. Cook, 5 Cir., 1970, 430 F.2d 1174.

We request the District Court to direct that with all possible expedition the Department of Health, Education and Welfare, the Parish School Board, and the bi-racial Advisory Committee make a thorough study in depth and report as quickly as possible as to any educationally feasible plan or plans which would further desegregate the schools named, in keeping with appropriate Constitutional standards. The District Court will hold any necessary hearings and make findings of fact, all of which is promptly to be reported to this Court for

action thereon, without the necessity of additional appeals.

After such study, the parties are encouraged to stipulate a solution, if possible for them to do so.

So ordered.