Virgie Lee **VALLEY, et al.,**
**Plaintiffs-Appellees,**

**United States of America,**
**Intervenor-Appellee,**

v.

**RAPIDES PARISH SCHOOL BOARD, et al., Defendants-Appellants,**

**and**

**Clyde Holloway, et al.,**
**Intervenors-Appellants.**

No. 81–3462.

United States Court of Appeals,
Fifth Circuit.

March 30, 1983.

Rehearing and Rehearing En Banc
Denied April 29, 1983.

---

Opinion on Denial of Rehearing and Rehearing En Banc, 705 F.2d 112.

Clark, Chief Judge, filed dissenting opinion.

John F. Ward, Jr., Robert L. Hammonds, Baton Rouge, La., for Rapides Parish School Bd.

Christopher Roy, Alexandria, La., Paul R. Baier, Baton Rouge, La., for Clyde Holloway et al.

Louis Berry, Alexandria, for Valley et al.

Franz R. Marshall, Gen. Litigation Section, Civil Rights Div., Dennis J. Dimsey, William Bradford Reynolds, Brian K. Landsberg, Appellate Section, Civ. Rights Div., Dept. of Justice, Washington, D.C., for the U.S.

Before CLARK, Chief Judge, POLITZ and RANDALL, Circuit Judges.

POLITZ, Circuit Judge:

For the sixth time we review an aspect of the litigation, initiated in 1965, involving the desegregation of the public schools in Rapides Parish, Louisiana. In *Valley v. Rapides Parish School Board,* 646 F.2d 925 (5th Cir.1981), *cert. denied,* 455 U.S. 939, 102 S.Ct. 1430, 71 L.Ed.2d 650 (1982) (*Rapides I*), we affirmed the finding and conclusion by the district court [1] that the vestiges of a state-imposed dual school system had not been fully eradicated, sanctioning most components of the remedial program fashioned by the district court. We reversed in part and remanded in order that the district court might reconsider and, if re-imposed, explain in greater detail that portion of its order directing the closure of Lincoln Wil-

---

1. 499 F.Supp. 490 (W.D.La.1980), *aff'd in part, rev'd in part and remanded,* 646 F.2d 925 (5th Cir.1981), *cert. denied,* 455 U.S. 939, 102 S.Ct. 1430, 71 L.Ed.2d 650 (1982).

liams, a predominantly black K–8 school in Cheneyville, and the closure of the predominantly white K–8 school in Forest Hill, coupled with the transfer of students from these two schools to an elementary and middle school in Lecompte, a community located midway between Cheneyville and Forest Hill.

Following a post-remand evidentiary hearing, the district court reviewed and rejected various alternatives proposed by the parties and readopted its original plan. On appeal, the school board and Forest Hill intervenors[2] focus their attack on the court's refusal to reopen the Forest Hill Elementary School. Concluding that the remedy imposed was commensurate with the constitutional violation, we affirm.

*Background Facts*

A detailed exposition of the factual and procedural history of this protracted litigation is set forth in our earlier opinion, reported at 646 F.2d 945. Our review today focuses on the legality of the district court's solution to the thorny problem presented by the continued existence of Lincoln Williams as a virtually all-black school (92.9%). In its earlier assessment, the district court found no white students available in the Cheneyville area to desegregate Lincoln Williams, and elected to close the school and reassign its pupils to Lecompte Elementary (K–3) and Carter Raymond Junior High (4–8), both in Lecompte. 499 F.Supp. 490. At the same time the court determined to reassign the student population of Forest Hill, with a minority enrollment of 8.3%, to the two Lecompte schools. Aside from Lecompte's central location, the district court cited no supportive reasons for the transfer of Forest Hill students to Lecompte and concomitant closure of that educational facility.[3]

In directing the district court to consider the various alternatives to the dismantling of Lincoln Williams and Forest Hill, and, in the event the court adhered to its 1980 decision, to explain the bases for rejecting such alternatives, we stated:

We cannot lend our sanction so easily, however, to those portions of the plan involving pupils and facilities in Wards 3 and 4. Here, as we have described, the district court elected to close a predominantly white rural school, Forest Hill, and a predominantly black school, Lincoln Williams, equidistant in different directions from the town of Lecompte, and to transfer their pupils to Lecompte schools. As far as we can determine, the only justification for closing Lincoln Williams was its predominance of black pupils. The court admitted that Forest Hill is more modern than Lecompte Elementary, but described the latter as having "much better location for purposes of integration," in terms of distance for busing of reassigned pupils. Alternatives are only sparingly mentioned.

These findings are an insufficient factual basis on which to approve the closing of Forest Hill and Lincoln Williams. Equally effective alternatives may exist which would avoid the closing of a modern facility and the intercommunity transfer of kindergarten pupils. These should be explored on remand and, if the district court adheres to its present plan, specific reasons for their rejection should be given. We cannot ignore the district court's disregard of neighborhood considerations for rural schools in this context. . . . Specific desegregation measures in southeastern Rapides Parish should be re-examined in light of the full range of mitigating equitable considerations.

646 F.2d at 940–41.

On remand, the district court received additional evidence from the Forest Hill

---

2. We earlier affirmed the district court's denial of the Forest Hill residents' motion to intervene. 646 F.2d at 941–42. On remand, the district court reconsidered the reasons underlying its initial ruling and granted the Forest Hill residents leave to intervene. The intervenors participated in the hearing on remand and in briefing and oral argument before this court.

3. Since 1966, all high school students in this southeast portion of Rapides Parish have voluntarily attended the desegregated Rapides High School in Lecompte.

intervenors, reviewed the various proposals submitted, and reinstated the student assignments for the Poland, Cheneyville, Lecompte and Forest Hill communities.[4] The trial judge reiterated his conviction that the dismantling of Lincoln Williams and the assimilation of its pupils into the Lecompte schools was the only reasonable alternative to perpetuation of Lincoln Williams as a racially identifiable school. Determined to effect an equitable distribution of the burden of desegregation, the district court remained convinced that Forest Hill's students should also be assigned to the Lecompte schools.

Having previously decided in *Rapides I* that the constitutionally mandated goal of educational unitization has not been achieved in Rapides Parish,[5] we need only address the appropriateness of the remedy ordered.

### Guidons

■ Failure on the part of school authorities to implement a constitutionally prescribed unitary school system brings into play the full panoply of the trial court's remedial power. *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 91

S.Ct. 1267, 28 L.Ed.2d 554 (1971); *Rapides I.* To discharge this weighty responsibility, the court is obliged to expunge from the public schools all vestiges of unlawful segregation. *Swann; Lee v. Macon County Board of Education,* 616 F.2d 805 (5th Cir.1980); *United States v. DeSoto Parish School Board,* 574 F.2d 804 (5th Cir.), *cert. denied,* 439 U.S. 982, 99 S.Ct. 571, 58 L.Ed.2d 653 (1978).

■ When reviewing a trial court's desegregation remedy, we are limited to ascertaining whether the court abused its discretion. *See Milliken v. Bradley,* 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977); *Swann.* We are mindful that "the scope of a district court's equitable power to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." *Swann,* 402 U.S. at 15, 91 S.Ct. at 1276. *See United States v. DeSoto Parish School Board.* Although "free to re-assess the district court's conclusions of law, its findings of fact must be accepted unless they are clearly erroneous." *Ross v. Houston Independent School Dist.,* 699 F.2d 218, 226 (5th Cir.1983), (*citing Pullman-Standard v. Swint,* 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982)).

4. In *Rapides I* we described the relevant features of the district court's original plan for desegregating several Rapides Parish schools, and the conditions the plan was designed to ameliorate:

> Before promulgation of the plan the Ward 3 town of Lecompte contained three schools, Lecompte Elementary, Carter Raymond, and Rapides High School. Lecompte Elementary and Carter Raymond each served pupils in grades K–8 under earlier orders. Each school had a majority of black pupils in the range of approximately 60 per cent. The Lincoln Williams School in Cheneyville, some 10 miles to the southeast of Lecompte, served all area pupils in grades K–8. The school was ... approximately 93% black, and is the "spur" for additional relief in this area of the parish. About the same distance to the west of Lecompte is the community of Forest Hill, which contained a K–8 school with a black attendance percentage of only 8.3. High school students from both communities went on to Rapides High School in Lecompte. Northeast of Lecompte in Ward 2 is the community of Poland, which had a K–12 school with 9.6 percent black pupils in attendance.

> The plan provided for Lecompte Elementary to become a K–3 facility, and for Carter Raymond to serve grades 4–8. Lincoln Williams was closed, and its K–8 pupils were transferred to the Lecompte schools. Forest Hill was also closed, with its pupils transferred to Lecompte Elementary and Carter Raymond. Pupils from the Poland School in grades 9–12 were shifted to Rapides High School.

646 F.2d at 933. All major provisions of this plan, together with certain minor amendments, were incorporated in the framework of the court's 1981 remedy.

5. That this action remains in the remedial phase distinguishes it from *Pasadena City Board of Education v. Spangler,* 427 U.S. 424, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976), where a unitary system had been achieved, and subsequent racial imbalances were precipitated by demographic changes rather than the acts or omissions of the school board. *See United States v. Board of Education of Valdosta, Georgia,* 576 F.2d 37 (5th Cir.), *cert. denied,* 439 U.S. 1007, 99 S.Ct. 622, 58 L.Ed.2d 684 (1978).

■ A trial judge's insight into local conditions is to be accorded substantial deference. While the remedy fashioned by the court "may be administratively awkward, inconvenient, and even bizarre" in some cases, "and may impose burdens on some ... all awkwardness and inconvenience cannot be avoided in the interim period when remedial adjustments are being made to eliminate the dual school systems." *Swann,* 402 U.S. at 28, 91 S.Ct. at 1282.

■ Appellate review of the district court's exercise of its broad discretion in formulating a desegregation plan is guided by the tripartite analysis set forth in *Milliken.* Consistent with *Milliken*'s teachings, a remedial order must be carefully tailored to correct the constitutionally infirm condition, restore the victims of segregation to the positions they would have enjoyed absent the proscribed conduct, and, where congruent with constitutional precepts, accommodate the interest of school officials in administering their affairs without judicial interference.

### Lincoln Williams

■ It is axiomatic that the existence of a few racially homogeneous schools within a school system is not per se offensive to the Constitution. *Dayton Board of Education v. Brinkman,* 433 U.S. 406, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977); *United States v. DeSoto Parish School Board; United States v. Seminole County School District,*

553 F.2d 992 (5th Cir.1977). The retention of all-black or virtually all-black schools within a dual system is nonetheless unacceptable where reasonable alternatives may be implemented. *United States v. DeSoto Parish School Board; Lemon v. Bossier Parish School Bd.,* 566 F.2d 985 (5th Cir.1978). *See Price v. Denison Indept. School Dist.,* 694 F.2d 334 (5th Cir.1982).

■ Various plans approved by the district court over the long history of this litigation did not realize one of their primary goals: desegregation of the Cheneyville schools. The court's attempt in 1975 to accomplish this objective by closing the majority white Cheneyville High School (K–12), and assigning all children residing in Cheneyville to Lincoln Williams proved unsuccessful because of an exodus of white pupils. On original hearing, and again on remand, the district court concluded that this constitutionally impermissible condition could not be remedied by pairing or clustering with the school in Poland, the only accessible "white" school.[6] Absent a pool of available white students, the court opted to reassign students living east of Cheneyville to Poland, which was reduced to a K–6 facility, and to transfer Poland's seventh and eighth grade students to Jones Street School. These assignments increased Poland's black student population from 9.6% to 36.8%. The district court was obviously persuaded, both before and after remand, that the only viable alternative to a segregated education for the remaining K–6 stu-

---

**6.** In arriving at this conclusion in 1980, the court took into consideration the likely recurrence of the "white flight" phenomenon if Lincoln Williams and Poland were clustered or paired. This rationale was reaffirmed in the court's post-remand decision. No objection has been interposed to the court's finding in this regard.

Generally speaking, community opposition to desegregation which takes the form of white flight will not justify a district court's failure to compel the total elimination of a non-unitary school system. *United States v. Scotland Neck City Board of Education,* 407 U.S. 484, 92 S.Ct. 2214, 33 L.Ed.2d 75 (1972). We have nonetheless held that the trial judge, in choosing among permissible plans, may select one calculated to minimize white boycotts. *Stout v. Jefferson County Board of Education,* 537 F.2d

800 (5th Cir.1976). *Accord, Ross v. Houston Independent School Dist.* (in seeking reduction in the number of one-race schools, the district court could not ignore diminished white enrollment attributable to "white flight"); *United States v. DeSoto Parish School Board* (a court need not ignore a likely danger of an exodus of white children from a school system). *See Parents Assn. of Andrew Jackson High School v. Ambach,* 598 F.2d 705 (2d Cir.1979); *Higgins v. Board of Education of the City of Grand Rapids,* 508 F.2d 779 (6th Cir.1974). Cognizant as we are of the deference to which the trial court's on-the-spot knowledge of this complex situation is entitled, *Swann,* we cannot gainsay its judgment that pairing or clustering with Poland would "in practice produce not more but less desegregation." *Stout,* 537 F.2d at 802.

dents in Cheneyville was to reassign them to the schools in Lecompte.

Nothing in the record attests to the presence of geographic or demographic barriers, insuperable distances, excessive travel times, or other factors which might militate against the court's resort to busing, a "normal and accepted tool of educational policy," *Swann*, 402 U.S. at 29, 91 S.Ct. at 1282. Indeed, Cheneyville is approximately nine miles south of Lecompte and is connected by a major highway, a portion of which is multi-laned. There is nothing to indicate that transportation of the former Lincoln Williams students to Lecompte presented any kind of logistical difficulty. Student busing over substantial distances is commonplace in the southeastern portion of Rapides Parish, where the population is diffused and some families live many miles from school facilities. Absent the desegregation wrinkle, busing has traditionally been warmly received as a welcome public service, particularly by families living in rural areas.

The record reflects that the efforts to desegregate Poland were progressing well. The court's obvious reluctance to disrupt this part of the total parish plan was eminently reasonable. *See United States v. Stout; United States v. School District of Omaha*, 521 F.2d 530 (8th Cir.) *cert. denied*, 423 U.S. 946, 96 S.Ct. 361, 46 L.Ed.2d 280 (1975). Because Lecompte Elementary and Carter Raymond were approximately 60% black, use of pairing or clustering techniques to transfer white students to Lincoln Williams would have served only to further skew the percentage of black pupils in these schools. However, both Lecompte schools could physically absorb the relatively small number of Lincoln Williams students. All relevant factors considered, we conclude that the decision to close Lincoln Williams and to reassign its students to Lecompte was within the ambit of the district court's expansive remedial authority.[7]

### Forest Hill

Once having confected an antidote for Cheneyville's segregative ills, the court was confronted with yet another dilemma—the projected increase in minority enrollment in the Lecompte schools occasioned by the influx of students from Lincoln Williams. This ineluctably led to the court's consideration of the predominantly white student body at Forest Hill, approximately nine miles west of Lecompte. Viewing the Cheneyville, Forest Hill and Lecompte schools as integral elements of a single educational network,[8] the court resolved to eradicate all

---

7. Invoking a formidable array of Fifth Circuit precedent, the school board contends that Lincoln Williams could not be closed for reasons relating to its racial character. *See Arvizu v. Waco Independent School District*, 495 F.2d 499 (5th Cir.1974); *Ellis v. Board of Public Instruction of Orange County, Florida*, 465 F.2d 878 (5th Cir.1972), *cert. denied*, 410 U.S. 966, 93 S.Ct. 1438, 35 L.Ed.2d 700 (1973); *Lee v. Macon County Board of Education*, 448 F.2d 746 (5th Cir.1971); *Mims v. Duval County School Board*, 447 F.2d 1330 (5th Cir.1971); *Bell v. West Point Municipal Separate School District*, 446 F.2d 1362 (5th Cir.1971); *Gordon v. Jefferson Davis Parish School Board*, 446 F.2d 266 (5th Cir.1971); *Wright v. Board of Public Instruction of Alachua Co., Fla.*, 431 F.2d 1200 (5th Cir.1970); *Robertson v. Natchitoches Parish School Board*, 431 F.2d 1111 (5th Cir.1970); *Hilson v. Ouzts*, 431 F.2d 955 (5th Cir.1970); *Carr v. Montgomery County Board of Education*, 429 F.2d 382 (5th Cir.1970).

This line of authority prohibits a school board's closure of schools racially identifiable as "black" for discriminatory purposes, as well as judicial approval thereof, but does not diminish the district court's traditional authority to dismantle one-race schools as a palliative for segregation. *See e.g., Swann; Morgan v. McDonough*, 689 F.2d 265 (1st Cir.1982); *Lemon v. Bossier Parish School Board*. *See also Mitchell v. McCunney*, 651 F.2d 183 (3d Cir. 1981) (closure of homogeneous black and white schools approved). It follows that the court's utilization of school closure as a remedial device, rather than as a means of perpetuating a dual system, did not, in contradistinction to the argument advanced by counsel for Forest Hills, function to deprive pupils of either school of their right to equal protection of the law.

8. We approved the district court's implementation of a parish-wide remedy in *Rapides I*, based on evidence that "[t]he entire parish operated as a dual segregated system in the past, and ... that the vestiges have not been eradicated 'root and branch' as required." 646 F.2d at 938. Once a constitutional violation of this dimension had been shown, the court was empowered to embrace Poland, Cheneyville, Le-

traces of unconstitutional segregation by dismantling Forest Hill's K–8 facility and shifting its students to Lecompte. The Forest Hill intervenors and the school board challenge the court's conclusion that the assignment of all elementary and middle school pupils within the tri-community region to Lecompte schools, accompanied by the closing of Forest Hill, offered the most reasonable prospect of successful desegregation, contending that the proposals they submitted would function more effectively to remedy the discrimination found to exist.

None of the parties take issue with the district court's unequivocal rejection of the school board's initial suggestion that Lecompte Elementary be closed and its students transported to Forest Hill. Among the factors influencing this decision were the adequacy of Lecompte Elementary's facilities, its central location, and the relative ease of busing Forest Hill students to Lecompte. Given the lack of a feasible alternative to Lincoln Williams' closure, the court was impelled to seek out, within practical limitations, an equitable allocation of the burden of desegregation by declining to close a second majority black school. *Arvizu v. Waco Independent School District,* 495 F.2d 499 (5th Cir.1974); *Cisneros v. Corpus Christi Independent School District,* 467 F.2d 142 (5th Cir.1972) (en banc), *cert. denied,* 413 U.S. 920, 93 S.Ct. 3053, 37 L.Ed.2d 1041 (1973). *See Brice v. Landis,* 314 F.Supp. 974 (N.D.Cal.1969) (when minority school being closed has adequate facilities and white students not bused, closing unjustified).

Other suggestions urged on remand were eliminated by the court for similar reasons. One series of suggestions called for the selective busing of a specified number of black children from Lecompte or Woodworth to Forest Hill (Forest Hill plans 1, 2 and 4). Another suggestion advocated maintenance of Lincoln Williams and Forest Hill as K–8 schools, and Lecompte Elementary as a K–4 school, with black pupils from Lecompte grades K–4 bused to Forest Hill, and white pupils from Lecompte

compte and Forest Hill within a single remedial

grades 5–8 bused to Lincoln Williams. Under this suggestion, Lecompte grade 4 would become almost all white, and Lincoln Williams grades 1–4 all black (School Board plan 1). Yet another series of suggestions sought the establishment of specific grade configurations at Forest Hill and Lecompte through the closure of Lincoln Williams, and the creation of K–5 schools at Forest Hill and Lecompte, a 6–8 school at Carter Raymond, and a K–6 school at Poland (School Board plans 2 and 3), anticipating the transportation of 78 and 108 Lecompte children to Forest Hill, respectively.

None of the plans suggested by the school board or the Forest Hill intervenors adequately insure a fair reconciliation of the competing interests involved. Some of the proposals would have unfairly burdened minority students. Others would in all probability have precipitated a reversion to the impermissible status quo—the perpetuation of Lincoln Williams as an essentially one-race school. None would spread equally the burden of desegregation.

By way of contrast, the plan developed by the court, with precious little of the assistance it had a right to expect from the parties, envisions the equidistant transportation of an equivalent number of white and black students in the same age bracket. The court's plan anticipates an even-handed distribution of the travails of desegregation. *See United States v. Texas Education Agency,* 467 F.2d 848 (5th Cir.1972) (en banc). *See also Mitchell v. McCunney,* 651 F.2d 183, 189 (3d Cir.1981) ("school board has an obligation to implement a student reassignment plan that will not dislocate black students significantly more than white students"). Plans submitted by the school board and the intervenors would not achieve the measure of desegregation realistically attainable. Thus their rejection by the district court did not constitute error or an abuse of discretion. *See Davis v. Board of School Commissioners,* 402 U.S. 33, 91 S.Ct. 1289, 28 L.Ed.2d 577 (1971).

plan.

Perhaps the most problematic of all proposals evaluated and rejected by the district court concerns the survival of both Lincoln Williams and Forest Hill as racially identifiable K–3 institutions. Pursuant to this proposal, first suggested by the private plaintiffs and later espoused by the Forest Hill intervenors, children in the early elementary grades would attend schools within their neighborhoods. While the court's opinion provides no guidance as to the rationale underlying its disallowance of neighborhood schools, our independent examination of the record persuades us of the appropriateness of the court's position.

■■■■ Though mindful of the worthy community values inherent in a neighborhood school, the maintenance of such values may not serve to supersede the constitutional imperative of desegregation. *See Swann; Rapides I.* We need hardly remind of that mandate at this point, nearly three decades after *Brown v. Board of Education.*[9] Federal courts are obliged to "make every effort to achieve the greatest possible degree of actual desegregation, taking into account the practicalities of the situation." *Davis,* 402 U.S. at 37, 91 S.Ct. at 1292. This constitutionally erected barrier to the operation of segregated schools applies to all children within the school system, including those in elementary grades. *Kelley v. Metropolitan County Board of Education of Nashville and Davidson County, Tenn.,* 687 F.2d 814 (6th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 834, 74 L.Ed.2d 1027 (1983); *Adams v. United States,* 620 F.2d 1277 (8th Cir.), *cert. denied,* 449 U.S. 826, 101 S.Ct. 88, 66 L.Ed.2d 29 (1980). *See Lee v. Macon County Board of Education; Anderson v. Dougherty County Board of Education,* 609 F.2d 225 (5th Cir.1980); *United States v. Board of Education of Valdosta, Ga.,* 576 F.2d 37 (5th Cir.), *cert. denied,* 439 U.S. 1007, 99 S.Ct. 622, 58 L.Ed.2d 684 (1978); *Mills v. Polk County Board of Education,* 575 F.2d 1146 (5th Cir.1978). Since "desegregation plans cannot be limited to the walk-in school," *Swann,* 402 U.S. at 30, 91 S.Ct. at 1283, courts must explore the

feasibility of a variety of remedial methods before lending their judicial imprimatur to the propagation or maintenance of one-race elementary schools. *Tasby v. Estes,* 572 F.2d 1010 (5th Cir.1978), *cert. dism. sub nom Estes v. Metropolitan Branches of the Dallas NAACP,* 444 U.S. 437, 100 S.Ct. 716, 62 L.Ed.2d 626 (1980). *See Swann; Lee v. Macon County Board of Education. See also Davis v. East Baton Rouge Parish School Bd.,* 570 F.2d 1260 (5th Cir.1978), *cert. denied,* 439 U.S. 1114, 99 S.Ct. 1016, 57 L.Ed.2d 72 (1979) (elementary, middle and high schools).

■■■■ Student transportation, one of the "desegregation tools" approved by the Supreme Court, cannot be discounted as a valid alternative to the education of elementary school children in a segregated environment unless the record demonstrates that "the time or distance of travel is so great as to either risk the health of the children or significantly impinge on the educational process." *Swann* 402 U.S. at 30–31, 91 S.Ct. at 1283; *United States v. Texas Educ. Agency,* 532 F.2d 380 (5th Cir.1976), *cert. denied,* 443 U.S. 915, 99 S.Ct. 3106, 61 L.Ed.2d 879 (1979). As we observed in *Rapides I,* the acceptable length and time of travel will perforce vary with the age of the children and the risk posed to their health. 646 F.2d at 939.

To buttress their contention that the court's plan would impose an excessive burden on Forest Hill K–3 students, the intervenors offered evidence that: (1) some children would travel approximately one hour each direction, (2) buses traveling between Forest Hill and Lecompte must traverse a railroad track, and (3) the Forest Hill school embodied the most treasured characteristics and qualities of the surrounding community. Photographs were offered to show the condition of the Forest Hill school buildings.

We are impressed with the sincerity and depth of feeling displayed by the Forest Hill parents. The record attests to the fine quality of the citizenship of these intervenors. They are law-abiding and supportive

---

**9.** 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954).

of our Constitution and laws. Balancing the equities when dealing with their small children is a particularly arduous task. Our painstaking review of the record nevertheless discloses no evidence to contradict the district court's finding, with respect to the children residing within 2.5 miles of the heart of Forest Hill or along the highway to Lecompte,[10] that "the burden of busing others into Forest Hill is far greater than busing Forest Hill students to Lecompte."

The proposals advanced by the school board and intervenors contemplate the transportation of black students from Lecompte to Forest Hill over the same highway as is claimed to be dangerous and overly long for the transportation of Forest Hill students to Lecompte. We are not persuaded that the burdens and risks of travel vary depending on the direction of travel and the complexion of the travelers.

We note further, as did the district court, that the older students have been riding the school bus to Lecompte for a number of years. High School students from the Forest Hill area have been bused to Lecompte voluntarily since the 1966–67 school year, and seventh and eighth graders must also now be bused from Forest Hill. The burden of busing the elementary school children is minimized by the previous establishment of busing for the older children. As the district court stated: "The elementary

students simply get on buses already loaded with their older brothers and sisters."

■ Finally, the district court found Carter Raymond and Lecompte Elementary to be structurally sound and capable of accommodating all students assigned.[11] Accordingly, upon consideration of all of the foregoing factors, we must concur in the district court's judgment that the intervenors' legitimate interest in preserving their neighborhood school must, in this instance, yield to the constitutional requirement that all children in the parish, black and white, share in a desegregated educational experience.

We thus conclude that the district court's decision to assign Forest Hill students to the Lecompte schools and to close Forest Hill school was a reasonable exercise of its equitable discretion. The record in this case supports the court's conviction that of all the proposals offered, its plan can best be expected to achieve the mandated conversion to a unitary system.

AFFIRMED.

CLARK, Chief Judge, dissenting:

I respectfully dissent. The mandate of this court's prior panel, 646 F.2d 925, controls this panel just as it did the district court. Although the majority starts its reasoning by quoting a crucial paragraph from

---

10. The intervenors attack the court's inclusion in its decree of the estimated 50 students who live in the Mill Creek, Bennett Bay and Blue Lake Road areas, to the west and south of Forest Hill. The government concedes that "the time and distance of busing these students would be considerable." As intervenors point out, no findings were made by the district court on the transportation burden, if any, sustained by these children. Forest Hill's evidence in this regard affords us little assistance, inasmuch as the bus drivers' trip tickets do not distinguish between elementary, junior high and high school children, all of whom ride the same buses. Nor does the map submitted provide a sufficient premise for evaluating the nature and extent of the burden imposed on the children vis-a-vis either their age, the putative health risks or any potentially deleterious effects upon the educational process. The testimony on this issue served only to describe the routes traveled by children living in the outlying environs of Forest Hill. In light of the paucity of evi-

dence pertaining to the time and distance of travel for younger children residing in the foregoing areas, we cannot assess the equities of their assimilation in the court's tripartite desegregation program. Upon proper motion, however, the court may wish to reconsider its assignment of students from these remote localities to Lecompte schools.

11. According to the intervenors, the district court's inspection of the Lecompte schools was an abuse of discretion. We are not persuaded. Forest Hill residents do not dispute the court's findings as to the adequacy of these schools, which findings are in fact corroborated by the proffered photographs. If Lecompte Elementary and Lincoln Williams were in disrepair or presented a palpable risk of harm, we are certain that the school board would not subject children to such hazards. *Lemon v. Bossier Parish School Board.*

that mandate, it has not applied its letter or spirit to the district court's order on remand which is before us for review today.

Specifically, the prior mandate vacated the order closing the Lincoln Williams and Forest Hill schools and required the district court to: (1) give regard to neighborhood considerations for rural schools, 646 F.2d at 944; (2) take into consideration such equitable factors as "[t]he length and time of travel ... in light of the age of the children, and the risk to health and probable impingement on the educational process," id. at 939; (3) only employ the "harsh remedy" of closing rural schools "if absolutely necessary to achieve the goal of a unitary system after all other reasonable alternatives have been explored;" id. at 940; (4) "explicitly state its justification for ordering a school closed" id. at 940; and (5) reexamine its closing of Lincoln Williams and Forest Hill schools "in light of the full range of mitigating equitable considerations" (id. at 941) because the district court's findings that Lincoln Williams had a predominance of black pupils and that Lecompte Elementary was older than Forest Hill but was "much the better location for purposes of integration" formed an insufficient basis to sustain the closings, id. at 940.

On remand, the district court wrote a new, longer opinion in which it changed and added words but I cannot find in them even one change of any substance to show that court complied with these commands.

On this appeal the majority has impermissibly substituted its present approval for the prior panel's rejection of the same schools closing edict on the same basic district court findings and erroneous premises. The net result is that this court has now affirmed a district court order that failed to tailor its remedy to the constitutional wrong identified in this case. The consequences are that innocents suffer and the law is brought into disrepute. The judgment should have been vacated again and the cause remanded, this time with explicit directions to limit relief to an appropriate remedy.

Of course a court's equitable powers to remedy past constitutional wrongs are very broad. *Swann v. Charlotte-Mecklenburg Bd. of Education,* 402 U.S. 1, 15, 91 S.Ct. 1267, 1275–76, 28 L.Ed.2d 554 (1971). Of course all reasonable methods to achieve this end are available. *North Carolina State Bd. of Education v. Swann,* 402 U.S. 43, 46, 91 S.Ct. 1284, 1286, 28 L.Ed.2d 586 (1971). These are basic premises of school desegregation law. The Supreme Court and this court have often held that courts pursuing this goal may bus children, reshuffle faculty, cluster, pair, rezone and close schools. But a court's powers in this type of case are not unlimited. Rather, they are confined to proper objectives. In the case at bar, the court's task was not, as it declared, to achieve an integrated student body in every school, or even to remedy every problem of racial imbalance that may exist within the school system. *Swann, supra* 402 U.S. at 24, 91 S.Ct. at 1280. Rather, it was limited to eradicating segregation cause by past school board practices. *Ross v. Houston Independent School District,* 699 F.2d 218, 227–28 (5th Cir.1983). In school desegregation cases the court's unnatural role becomes that of a super school board and temporary school administrator. It is a role which must be played with circumspection and care for the damage which overbroad remedial bans do to children, parents and communities who have offended no one.

The existence of great power does not permit its fullest exercise in every case. Because the court has limited objectives and a limited role, the scope of the remedy it devises must be tailored to fit the nature and extent of the constitutional violation found. *Hills v. Gautreaux,* 425 U.S. 284, 293–94, 96 S.Ct. 1538, 1544–45, 47 L.Ed.2d 792 (1976). The prior panel mandate required the district court to reexamine that portion of its order closing Lincoln Williams and Forest Hill in light of the full range of mitigating equitable circumstances it described. It required the district court, not this appellate court, to explore all other reasonable alternatives before it reinstated the "harsh remedy" of "closing a facility built and maintained at the expense of local

taxpayers." Not a single one of the "full range of mitigating, equitable circumstances" (and there were many) required to be considered was discussed or distinguished or applied. The district court really did no more than put the wine of new words in the old skin of school closings because it saw no other remedy to integrate Lincoln Williams.

When the district court reordered the closing of the Forest Hill and Lincoln Williams schools, these two communities lost their only schools. Children from both communities must now be bussed many miles from their homes. Expert evidence placed in this record on remand established that closing a town's only school, especially one located in a small settlement, traumatizes the whole town. The greatest costs are to the families that include school-aged children, but hurtful repercussions extend throughout the community.

Parents in both "burdened" communities, one predominately white, the other predominately black, asked the court to leave their schools open, at least for their youngest children. Their petitions were ignored. These children, ranging in age from kindergarten through early elementary grades, must rise early, board buses, drive past their community school houses and go into a distant town and then reverse the journey in the evenings. Some will spend two hours a day on the school bus. Their names are not recorded. Their family situations are not detailed. Their needs, their hopes, their rights are dashed without discussion. If a five-year-old gets sick or forgets her coat or her lunch and wants to contact her parents she must make a long distance telephone call to reach her home. It seems small solace for the majority to suggest that some such children may have high school-aged siblings who will be on the bus with them part of the way. Much more remarkable, I think, is the fact that the children, parents, and communities who are so damaged did not cause or contribute in any way to the conceived constitutional wrong the court sought to remedy. Indeed, the district court and the majority both state that the people of Forest Hill have been altogether law-abiding and free of guilt.

Why then have they been put to this grief? For integration, the district court said. It saw no other reasonable prospect to integrate Lincoln Williams because its prior order paring Lincoln Williams had been defeated by white flight. But the Cheneyville students and parents who now plead to keep their school did not leave it. Why must their plea to keep their school open go unheeded? At the opposite base of this triangle, the pleas of the Forest Hill students and parents who also want to keep their school were equally ignored. Why? Why must the "harsh remedy" be imposed on them without weighing the "full range of mitigating equitable considerations" they brought forward? "[T]o effect an equitable distribution of the burden" the majority says. I can see that the punishment inflicted on the citizens of Forest Hill is comparable to the punishment inflicted on Cheneyville, but I cannot detect a spark of equity in heaping the coals of sorrow on the heads of either community. The record shows without contradiction that the Forest Hill area became predominantly white because of a change in the community's economic-industrial conditions which had nothing to do with schools. *Cf. Pasadena City Board of Education v. Spangler,* 427 U.S. 424, 436, 96 S.Ct. 2697, 2704–05, 49 L.Ed.2d 599 (1967). Neither the Lincoln Williams nor the Forest Hill school was constructed or maintained to evade desegregation. The school board has never used either school for racial purposes. The punishment of these innocents fits no crime of their or the district's making.

For eighteen years this school district has been under the injunctive edicts of federal courts. It has not violated one. The fault for any perceived shortcomings in the district, lies at the doorstep of the federal courts, not the school district, its staff or patrons. Moreover, courts delude no one but themselves when in the name of justice they make wholesale adjustments to the intimate, individual and differing rights of hundreds of citizens. If this latest edict proves nothing else, it will prove again that courts are a totally inadequate institution

to resolve with broad injunctions the numerous, complex, interrelated rights which comprise a "school case."

The district court accepted as its "principal purpose ... the adoption of a plan which achieves the greatest amount of integration." This was wrong. Integration is not a constitutional command. One race schools which are not the result of past segregation do not keep a school district from being unitary. *Swann, supra,* 402 U.S. at 25–26, 91 S.Ct. at 1280–81. This false premise led the district court to close Lincoln Williams to its patrons. As errors are prone to do, it, in turn, caused the further error of closing Forest Hill to bring misery company. The two wrongs do not make a right.

More's the pity. Even accepting the district court's erroneous premise of a duty to integrate, its plan for achieving theoretical integration was not the best remedy available. A less disruptive solution was identified by the parties. Under the school board's third plan, children from predominantly black zones in the Lecompte areas could have been bussed to Forest Hill. This plan could have been supplemented in the manner suggested by a group of Cheneyville citizens who proposed that the Lecompte elementary schools be closed. If this approach had been used, that community could have retained a seventh and eighth grade school and four-year high school for their own children as well as those from Cheneyville and Forest Hill. Children from predominantly white areas in the Lecompte region could have been bussed to Lincoln Williams. Instead of closing the only schools in two communities, just one of the three Lecompte area schools would have been closed. Carter Raymond and Lecompte High could have continued to serve the area. Instead of bussing children from two communities, only children from one area would have had to be bussed. As the court aptly observed, the road mileage between these communities is no greater in one direction than the other. Statistically, the desired racial mixture could have been achieved in both schools.

The assumption of the district court and the majority that there was no alternative to closing Lincoln Williams was erroneous. The threat of flight by white children to be bussed from Lecompte to Lincoln Williams does not justify rejection of this plan any more than the threat that pupils from Forest Hill won't go to Lecompte Elementary or the threat that blacks from Cheneyville will not follow the court's plan. Of course the court was not required to ignore a likelihood of pupil flight. It had happened before. In a free country it may happen again. A court's school order can mandate county officials in the performance of their duties, it can map zone boundaries and it can fence in schools, but it cannot command a single student to go to a single school for a single day.

But just as *United States v. Scotland Neck City Bd. of Education,* 407 U.S. 484, 491, 92 S.Ct. 2214, 2218, 33 L.Ed.2d 75 (1972) establishes that flight cannot be accepted as a reason for achieving anything less than complete uprooting of the dual school system, it cannot be accepted as a reason for reaching past the wrong to be remedied when a less disruptive, equally effective plan is available. It cannot do so because a remedy that exceeds the wrong to be righted violates clear precedent of the Supreme Court and this court. It cannot do so here because the district court's order disobeys the controlling mandate of the prior panel. The court did not demonstrate that its plan was more likely to be effective than the possible plan that would close only one of Lecompte's schools. Indeed, the record indicates quite to the contrary.

In thirteen years on this court I have participated in the affirmance of a number of public school desegregation plans. Most have been, as most are, successful in theory only. I nevertheless remain readily obedient to my obligation to follow precedent. But that does not keep me from knowing what everyone knows—zones, pairs, clusters and bussing are workable remedies for school desegregation only in extreme cases. When the problem is reduced to dealing with people of good will who have done no

wrong, maximum use of the neighborhood school is the key to assuring equal educational opportunity. That equality of opportunity is the constitutional lodestar. In some cases, precedent and prior school district actions will proscribe the maximum preservation of neighborhood schools. This is clearly not such a case. The prior panel established that the district court should have followed its mandate. So should we.