Eddie Mitchell TASBY, et al., Plaintiffs,

v.

Marvin EDWARDS, General Superinten-
dent, Dallas Independent School
District, et al., Defendants.

Civ. No. 3:4211-H.

United States District Court,
N.D. Texas,
Dallas Division.

Nov. 5, 1992.

See also 799 F.Supp. 652.

Edward B. Cloutman, III, Law Offices of
Edward B. Cloutman, III, Dallas, TX, for
plaintiffs.

Robert H. Thomas, P. Michael Jung,
Strasburger & Price, Leonard J. Schwartz,
Dennis J. Eichelbaum, School Attys., Dallas
Independent School Dist., Dr. Donald E.
Hood (External Auditor), Donald E. Hood
& Associates, Inc., Dallas, TX, for defen-
dants.

E. Brice Cunningham, Intervenor Black
Coalition, Dallas, TX, for intervenor.

MEMORANDUM OPINION
AND ORDER

SANDERS, Chief Judge.

Before the Court are Defendant Dallas
Independent School District's ["DISD" or
"the district"] request for Court approval
of the Adoption of Projects for the 1992
Bond Election, filed October 2, 1992; Plain-
tiffs' Response to Defendants' Report on

Adoption of Projects, filed October 13, 1992; Intervenor Black Coalition's Response to DISD's Report, filed October 14, 1992; Plaintiffs' Further Response on DISD's Report, filed October 20, 1992; DISD's Report on Costs and Priorities, filed October 27, 1992; Comments of the External Auditor on DISD's Townview Proposal, filed October 29, 1992 ["Auditor's Report"]; and DISD's Response to the Auditor's Report, filed October 30, 1992.

## I. BACKGROUND

On November 2, 1992, the Court held a hearing to determine whether to approve DISD's proposal for construction of Townview Magnet School.[1] Townview is to be a centrally located "supermagnet," housing six of the district's existing magnet programs in a state-of-the-art facility. Defendant DISD proposes a budget for the school of $29.9 million, reduced from the $44–$45 million originally contemplated in the early 1980s. Plaintiffs and Intervenor question this budget reduction, and ask the Court to defer approval of the downsized Townview until it can be determined that the reduction does not compromise the educational integrity of the school as designed.

To understand the doubts of Plaintiffs and Intervenor, a brief history is helpful. Magnet schools generally have been a crucial part of the process of desegregation of Dallas schools. The concept of consolidating several high schools into a centrally located facility existed as early as 1976, in the Court Order that established the Dallas desegregation plan and implemented the magnet program. *See Tasby v. Estes,* 412 F.Supp. 1192, 1205–06 (N.D.Tex.1976) (Taylor, J.). In subsequent orders, the Court has reaffirmed the need for a centrally located magnet school. *See, e.g., Tasby v. Wright,* 520 F.Supp. 683, 745–47 (N.D.Tex. 1981), *aff'd in part, rev'd in part,* 713 F.2d 90 (5th Cir.1983); *Tasby v. Wright,* 542 F.Supp. 134, 144 (N.D.Tex.1982); *Tasby v. Edwards,* No. 3–4211 (N.D.Tex. November 13, 1991) ["November 13 Order"]. Thus,

the building of Townview has been on the public conscience for nearly a generation.

In the early 1980s, the district developed detailed educational specifications and an architectural design for Townview at a projected cost of some $45 million. Homes on the proposed Townview site were removed in order to clear the land for construction. The overall mood was one of strong community commitment to a project that would be the pride of the Dallas school system and unmatched in the nation.

In 1983, however, a depressed Dallas real estate market thwarted the sale of the district property that was to have been the source of financing for Townview. Since that time, the district has been unable to locate the funds to build the supermagnet.

On November 13, 1991, in response to Plaintiffs' and Intervenor's frustration with years of delay, the Court after a hearing explicitly ordered the Dallas Independent School System to construct Townview Magnet School. November 13 Order, at 3. In that order, the Court noted that "construction of Townview is a prerequisite to Defendants' attaining unitary status." *Id.* The Court deferred ruling on Plaintiffs' request that the school be financed with a Court-ordered tax; instead, the Court relied on the district's professed ability to finance Townview with a bond election to be held not later than December 1992. *Id.* at 3–4; *see Missouri v. Jenkins,* 495 U.S. 33, 52, 110 S.Ct. 1651, 1663, 109 L.Ed.2d 31 (1990) (reaffirming a district court's authority to require a school district to levy taxes in aid of desegregation, but requiring that local officials first "have the opportunity to devise their own solutions to these problems").

Implicit in the Court's 1991 order to build Townview was approval of then-existing plans for the school at a budget of approximately $45 million. The Task Force on Facilities, which had listed construction of Townview as its top-priority project, filed its report of August 29, 1991, based on that original budget. As late as summer of

---

1. The district has called a bond election for December 5, 1992. This order addresses only the Townview aspect of the bond package and

should not be construed to apply to the bond issue as a whole or to any other project therein.

1992, the projected budget of $45 million was apparently still in force. At that time, the district employed architects to investigate whether Townview's size could be reduced in light of more recent technology. The cost-saving effort was undertaken in an attempt to free funds for new schools and additions in order to relieve grave overcrowding in many predominantly minority schools.

The result of the architects' work was a reduced Townview budget of $29.9 million, to be allocated according to one of three plans: Option 1, approved by the Board of Trustees of the district, would move all six magnets to Townview; Option 2 would move only five, leaving the Talented and Gifted program at its present location; and Option 3 would move only four magnets, sending Science and Engineering to join TAG at Pinkston.

On September 24, 1992, the Board approved a downsized Townview (Option 1) to be one of the projects included in the December 1992 bond package. The vote was six to two: one of the three African–American board members voted with the majority; the other two, Dr. Yvonne Ewell and Ms. Kathlyn Gilliam, voted against the proposal.

Plaintiffs' and Intervenor's concerns about the reduction in Townview's budget are twofold. First, they question whether the programmatic effectiveness of the supermagnet would be negatively affected by the proposed reduction of the facility. *See* Auditor's Report, at 15–16. Second, they are joined by members of the Black community, individually and in the Townview Restoration Committee, in expressing concern that the promise of Townview, long postponed, is now to be kept only in part.

In light of this history, the Court agrees that African–American citizens of Dallas have relied on an expectancy of a magnificent Townview amounting almost to a promise; these citizens are justified in their frustration that Townview is even still a changing concept. More importantly, however, the Court is of the view that Townview must leave the realm of the merely conceptual and must become a reality. The Court concludes that reducing Townview in size, as approved by the Board of Education, is the only feasible way in which Townview is likely to receive the necessary funds from the December 1992 bond issue for the school's immediate construction.

Accordingly, the Court rules today as a matter of law, subject to the important limitations and requirements detailed below, that the DISD's current $29.9 million proposal for construction of a downsized Townview will not adversely affect desegregation of Dallas schools. Indeed, the prompt construction of Townview will tend to further the desegregation process.

## II. PRINCIPLES OF DESEGREGATION

█ The legal standards governing the Court's decision today are indelibly established. Paramount is that each previously segregated school system has a continuing affirmative duty to accomplish the maximum desegregation practically achievable. *Swann v. Charlotte–Mecklenburg Bd. of Educ.*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); *Green v. New Kent County Sch. Bd.*, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968).

█ In achieving the maximum desegregation practicable, the District Court has broad powers to establish equitable remedies. *Swann*, 402 U.S. at 12–16, 91 S.Ct. at 1274–76; *Valley v. Rapides Parish Sch. Bd.*, 702 F.2d 1221, 1225–26 (5th Cir.), *cert. denied*, 464 U.S. 914, 104 S.Ct. 276, 78 L.Ed.2d 256 (1983) [*"Rapides II"*]. The Court's remedies, however, should be designed in light of a school district's particular circumstances and available options. *Milliken v. Bradley*, 433 U.S. 267, 280, 97 S.Ct. 2749, 2757, 53 L.Ed.2d 745 (1977) [*"Milliken II"*]; *Green*, 391 U.S. at 439, 88 S.Ct. at 1694. Further, desegregation remedies should accommodate the interests of school officials in administering a constitutionally adequate system without judicial interference. *Milliken II*, 433 U.S. at 280–81, 97 S.Ct. at 2757; *Rapides II*, 702 F.2d at 1226.

█ Finally, the Court must view the entire school district as a whole and not

school by school. *United States v. Board of Educ. of Valdosta, Georgia,* 576 F.2d 37, 39 (5th Cir.), *cert. denied,* 439 U.S. 1007, 99 S.Ct. 622, 58 L.Ed.2d 684 (1978). With these tenets in mind, the Court turns to the DISD's proposal for construction of a downsized Townview.

## III. TOWNVIEW

 Looking at the tentative plans proposed by the Dallas Independent School District, the Court finds that Townview, though reduced in size,[2] will indeed be a superb facility, well worth the efforts of the Dallas citizens and the members of the Board of Trustees who have worked so hard to make the supermagnet a reality. The mammoth three-story structure will have natural lighting, a full gymnasium, an outdoor track, a "commons" capable of accommodating up to one half of the students at any one time, and a 350–seat theater which will be available for community use. The classrooms, laboratories, and other facilities will meet or exceed Texas Education Agency requirements. Importantly, the architect assures the Court that essential quality and durability of construction will not suffer because of the reduction of Townview's budget. Indeed, at a proposed cost of $80 to $85 per square foot, the supermagnet will be by far the best, most functionally state-of-the-art educational facility in Dallas.

At the Townview hearing, citizens expressed concern at the deletion of the planetarium and the computer center, the reduction of classroom size, the modification of the Wellness Center, and the downgrading of construction materials. To the extent these concerns have an impact on the Court's role in monitoring desegregation, they are addressed below.

Foremost among the Court's concerns is whether the building as currently proposed will accommodate the educational specifications of the six magnets. The Court is bothered by the lack of concrete informa-tion on this aspect of Townview. The district's failure to provide this information is especially worrisome in light of its express promise, on which the Court relied in 1991, that final Townview plans would be "completed and ready for implementation by December 1992." November 13 Order, at 2.

At the hearing, however, the district introduced evidence that persuades the Court to approve at least provisionally the district's proposed plan. For example, it is undisputed that all six principals have been consulted and have approved moving their magnets to a downsized Townview. Moreover, the Superintendent of Schools, Dr. Marvin Edwards, testified unequivocally that the six magnets can be programmatically accommodated under the district's plan.

Further supporting testimony was provided by Ben Graves, Director of the Educational Facilities Laboratory of Austin, Texas. An experienced facilities planner, Mr. Graves participated in the original Townview design process in 1983–84 and assisted in the development of the school's educational specifications. After revisiting the original Townview design and meeting with the six principals, Mr. Graves offered his expert opinion that the physical accommodations in the proposed Townview would be superior to those now available in the existing magnet schools. More importantly, Mr. Graves testified that downsizing Townview need not adversely affect the magnets' educational programs.

In explaining his opinion, Dr. Graves pointed out that the technology on which some of the original Townview was based is now obsolete. For example, the original design included a large central computer room, complete with a mainframe computer of antiquated size; the new design provides instead for personal computers to serve each classroom. Further, Dr. Graves testified that another major deletion, the plane-

---

**2.** Option 1 of the proposed Townview plan calls for a reduction in net square footage of about 25%, from about 287,000 to about 218,000 square feet. At the hearing, the district introduced an additional plan, Option 1A, which would accommodate about 400 extra students and would increase the total square footage to a number approaching the original. Under either option, there is room for expansion.

tarium, was never part of the original academic programming and in his opinion would have no essential academic purpose in conjunction with the magnet programs. Finally, it was Mr. Graves's testimony that the 700–square–foot academic classrooms, reduced from about 800 square feet, provide sufficient space for effective instruction. Thus, according to the facilities planner, it would be possible for the district to reduce Townview as proposed without harming the educational specifications or programs as originally designed.

Credence is lent to Dr. Graves's opinion by the testimony of the district's architect, Darrell A. Fitzgerald. Mr. Fitzgerald relayed to the Court that when asked to revisit the original plans for Townview, his instructions were to see if he could reduce the overall budget to below $30 million while keeping the programs intact. He testified that he has succeeded in that task.[3] Overall, then, the Court concludes that the proposed reduction in Townview's size need not adversely affect the quality of education its students will receive.

Turning to an analysis of the effect of the Townview proposal on the district as a whole, the Court is convinced that the effect is positive. It is undisputed that many of the buildings currently housing the six magnet schools are only marginally adequate for their programs and are in serious disrepair. Townview's timely construction therefore can only improve the future of the magnet program in Dallas.

Further, the $29.9 million Townview budget represents an already large portion of a total bond package of some $275 million.[4] Most of the remainder of the bond issue is earmarked for relief of overcrowded predominantly minority schools throughout Dallas. Although the Court declines to speculate on the mood of Dallas voters, the president of the Board of Education, Rene Castilla, testified that Dallas voters would be unlikely to approve a larger bond issue because of the necessity in that event for an immediate tax rise. Passage of the bond issue is crucial. The Court therefore believes that failure to approve the reduction of the Townview budget might jeopardize the process of desegregation in the district as a whole.

## IV. CONCLUSION

Accordingly, the Court hereby approves the district's proposed budget of $29.9 million for Townview Magnet School. Without reservation, the Court approves the following aspects of the proposal: the elimination of the central computer facility and any contemplated School of Computer Technology; the elimination of the planetarium; the reduction in academic classroom size to 700 square feet; the modification of the Wellness Center; and the overall reduction in square footage of the school.

However, the Court's approval is expressly conditioned on the following requirements:

(1) Townview must include all six magnet schools, as proposed in Option 1 or in Option 1A.[5]

(2) The programmatic needs of the magnets must be fully met by the Townview facility.

(3) The proposed reduction in teaching stations must not adversely affect the magnet programs.

(4) The "contingency fund" included in the December 1992 bond package must be available for use on Townview should the

---

3. From the testimony of Mr. Graves and Mr. Fitzgerald, it is clear to the Court that, downsized or not, the plans for Townview require modernization and cannot be implemented as originally designed. No matter what the Court decides today, Townview's construction will require the same amount of time to complete.

4. It should be remembered that Townview is actually six schools combined into one and thus justifies the seemingly disproportionate allocation of bond money.

5. The six magnets are Science & Engineering, Business & Management, Education & Social Services, Health Professions, Government & Law, and Talented & Gifted. Deleting either the Talented & Gifted program (Option 2) or both TAG and the Science & Engineering Magnet (Option 3) might result in a Townview racial balance unacceptable to the Court.

final plans require an increase in the proposed budget of $29.9 million.

The district has assured the Court that it will be able to meet these requirements easily. Accordingly, the district is DIRECTED to certify to the Court by *August 2, 1993*, that these requirements have been fulfilled.

Linked with the Court's approval of DISD's Townview proposal is the following mandate: There must be no further delay. The Court relies on the assurance of the district that Townview will have the highest construction priority of any project in the bond package.

In deciding an appropriate schedule for the design and construction of Townview, the Court is guided by the evidence presented by the district. At the hearing, projections by district witnesses of a reasonable deadline for completion of Townview ranged from the Superintendent's estimate of September 1994 to the architect's estimate of December 1995, though the architect, Mr. Fitzgerald, testified that it would be possible to accelerate the process to cut 25–30% off the estimated time. The Court therefore believes that a reasonable deadline for the opening of Townview would be the beginning of the school year of 1995–96. That date is conservatively within the district's estimates—less than a 10% acceleration of the longest estimate of construction time—and yet reflects the Court's mandate of extreme diligence in this matter.

Accordingly, the Dallas Independent School District is DIRECTED to file for the Court's approval a completed Townview programmatic design and architectural plan by *noon, August 2, 1993*. Further, the DISD is DIRECTED to have a completed Townview fully ready for student occupancy for the *1995–96 school year*. Failure to meet these deadlines will expose Defendants to civil contempt proceedings and to sanctions of up to $20,000 per day for each day the deadlines are exceeded.

SO ORDERED.